**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AMERICAN PETROLEUM INSTITUTE, NATIONAL MINING ASSOCIATION, and THE BUSINESS COUNCIL OF NEW YORK STATE, INC., *Plaintiffs*, v. LETITIA JAMES, in her official capacity as New York Attorney General, and SEAN MAHAR, in his official capacity as Interim Commissioner of the New York Department of Environmental Conservation, *Defendants*. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The Chamber of Commerce of the United States of America, the American Petroleum Institute, the National Mining Association, and The Business Council of New York State, Inc., bring this civil action against Defendants for declaratory and injunctive relief and allege as follows:

**INTRODUCTION**

1. New York has enacted a plainly unconstitutional law imposing $75 billion in strict liability on a targeted group of energy companies for their lawful conduct and the lawful conduct of third parties overwhelmingly undertaken in other jurisdictions. This law—known as the Climate Change "Superfund" Act, S.2129B, Chapter 679, Laws of 2024 as amended by the recently passed S.824 ("Act" or "New York's Act")[1]—does not limit its regulation to greenhouse gas emissions

---

[1] On February 28, 2025, Governor Hochul signed Chapter Amendments to S.2129B which amend the terms of the New York Act and are incorporated into the Act. *See* S.824.

released in New York. Rather, it seeks to punish a narrow set of energy producers[2] for global greenhouse gases emitted into the atmosphere from sources around the world over the course of nearly three decades that allegedly caused damage to the State. New York seeks to reach back decades in time and impose significant monetary penalties on those producers (operating almost completely outside the State), potentially subjecting other States and consumers to increased energy costs, while reaping the financial benefits to pay for "[c]limate change adaptive infrastructure project[s]." N.Y. Env't Conservation Law § 76-0101(3), (14).[3]

2.    New York joins its neighbor Vermont as the first States to enact legislation specifically intending to impose strict liability on companies for their purported shares of global, lawful greenhouse gas emissions based on completely unsubstantiated "attribution science." Two of the Plaintiffs here have challenged Vermont's law on the same grounds raised in this Complaint. *See* Complaint, *Chamber of Com. of the U.S. of Am. v. Moore*, No. 2:24-cv-01513 (D. Vt. Dec. 30, 2024). And like Vermont's law, New York's Act is unconstitutional, running afoul of Second Circuit and Supreme Court precedent.

3.    The Second Circuit has held that federal law prohibits the application of New York tort law to impose liability on energy producers for harms allegedly caused in the Empire State by greenhouse gases emitted outside the State. *City of New York v. Chevron Corp.*, 993 F.3d 81, 91-99 (2d Cir. 2021). That precedent makes clear that neither the Constitution nor the Clean Air Act

---

[2] The Act covers certain entities that engage in "the trade or business of extracting fossil fuel or refining crude oil," N.Y. Env't Conservation Law § 76-0101(21), where "fossil fuel" is defined to include "coal, petroleum products and fuel gases," N.Y. Energy Law § 1-103(7); *see also id.* § 1-103(8) (defining "fuel gases" to include natural gas); N.Y. Env't Conservation Law § 76-0101(12) ("'Fossil fuel' shall have the same definition as in section 1-103 of the energy law."). For ease of reference, these entities are referred to as "energy producers" throughout the Complaint.

[3] Unless otherwise noted, statutory citations are to Article 76 of New York's Environmental Conservation Law.

allows a State to impose liability or penalties on out-of-state energy producers for harms arising from out-of-state and global greenhouse gas emissions. *Id.* The Act is therefore precluded by federal law.

4.     New York has thus exceeded the bounds of its authority, inserting itself into an area of law that is and has historically been controlled only by federal law, upsetting the careful regulatory balance the Clean Air Act establishes, violating the extraterritorial restraints of our federal system, and transgressing the bounds of due process and other constitutional protections. For the reasons explained below, New York's Act is unconstitutional and must be enjoined.

5.     New York's Act requires certain energy producers that are subject to the jurisdictional reach of the State, as determined by the State, both domestic and international—termed "responsible parties"—to pay "cost recovery demand[s]" to the State of New York to fund New York's newly created "climate change adaptive infrastructure fund." § 76-0101(3). The Act assigns responsibility for greenhouse gas emissions based on each "responsible party's" *worldwide* total volume of extracted fossil fuels and refined petroleum during the covered period. § 76-0101(8). The Act declares these energy producers "strictly liable" for their purported share of global greenhouse gas emissions, § 76-0103(3)(a), by forcing them to collectively pay a total of $75 billion to the State, § 76-0103(2)(a), defined as the "cost recovery amount," §§ 76-0103(3)(b), 76-0101(6). The Act calculates the penalty that individual energy producers must pay based upon "the same ratio to the cost recovery amount as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions of all responsible parties." § 76-0103(3)(b). It also provides that "[s]uch payments in aggregate shall total the cost recovery amount and shall be due and payable on the applicable payment date." § 76-

0103(2)(a). And the Act explicitly states that emissions attributed to each responsible entity "are not limited to such emissions within the state [of New York]." § 76-0101(8).

6.      The Act is unconstitutional and a violation of federal law for multiple reasons.

7.      *First*, the U.S. Constitution precludes the Act. Under our federal constitutional structure and inherent principles of the Constitution, federal law governs "[w]hen we deal with air and water in their ambient or interstate aspects." *Illinois v. City of Milwaukee*, 406 U.S. 91, 103 (1972) ("*Milwaukee I*"); *City of New York*, 993 F.3d at 91-92. In such interstate pollution disputes, there is "an overriding federal interest in the need for a uniform rule of decision" and "basic interests of federalism" demand the application of federal law. *Milwaukee I*, 406 U.S. at 105 n.6. "This is because such quarrels often implicate [those] two federal interests that are incompatible with the application of state law." *City of New York*, 993 F.3d at 91-92 (citation omitted). Moreover, the Constitution recognizes the "equal sovereignty" afforded to all States, *see, e.g.*, *Shelby County v. Holder*, 570 U.S. 529, 544 (2013), and establishes a structure under which a sovereign cannot legislate "except with reference to its own jurisdiction," *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881), which is "co-extensive with its territory," *United States v. Bevans*, 16 U.S. (3 Wheat.) 336, 387 (1818). "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996). And "[o]ur system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Zschernig v. Miller*, 389 U.S. 429, 442-43 (1968) (Stewart, J., concurring) (citation omitted). Thus, the Act's imposition of liability and significant penalties on energy producers for harms allegedly caused by greenhouse gas

emissions beyond New York's borders—and beyond the borders of the United States—is barred by the federal Constitution.

8.      *Second*, New York's Act is preempted by the federal Clean Air Act. "[T]he Supremacy Clause 'invalidates state laws that "interfere with, or are contrary to," federal law.'" *Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 86-87 (2d Cir. 2003) (citations omitted). Moreover, "'resort[ing] to state law' on a question" that has historically been governed by federal law "is permissible only to the extent 'authorize[d]' by federal statute." *City of New York*, 993 F.3d at 99 (quoting *Illinois v. City of Milwaukee*, 731 F.2d 403, 411 (7th Cir. 1984) ("*Milwaukee III*")). Therefore, under the Supremacy Clause, state regulation of interstate greenhouse gas emissions is only permissible as authorized by the Clean Air Act. And under the Clean Air Act, only a "slim reservoir" of state authority remains to regulate greenhouse gas emissions outside the Clean Air Act's regulatory scheme. *Id.* at 100. Specifically, the Clean Air Act "permit[s] only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id.* (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497 (1987)). Here, because New York's Act seeks to impose liability for global greenhouse gas emissions from sources well beyond New York's borders, the Clean Air Act preempts it.

9.      *Third*, the Act violates the Due Process Clause of the Fourteenth Amendment. Economic legislation violates the protections of due process where it is "arbitrary and irrational," *E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality opinion) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)), or where it is particularly "harsh and oppressive," *Canisius Coll. v. United States,* 799 F.2d 18, 25 (2d Cir. 1986) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984)). Here, the Act transgresses those protections because it: (i) imposes an overly harsh and oppressive retroactive penalty for greenhouse gas emissions released by third parties over 25 years during which energy producers lawfully extracted and refined

fossil fuels around the world; (ii) imposes an irrational and arbitrary punishment based on an unfair and flawed calculation method that singles out a handful of disfavored energy producers who the State determines are subject to its jurisdictional reach and attempts to hold them responsible for global greenhouse gas emissions emitted by others; (iii) imposes an unconstitutionally vague penalty with the amount of that penalty left to the discretion of state agencies; and (iv) lacks procedural safeguards to avoid the imposition of arbitrary and excessive penalties.

10.    *Fourth*, the Act violates the domestic and foreign Commerce Clauses. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 372-74 (2023); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448-49 (1979). The Act discriminates against the important economic interests of other States by targeting large energy companies located almost exclusively outside of New York. Indeed, among other things, the Act targets energy producers for oil refining and coal mining activities when no such activities take place in New York, demonstrating that the Act, on its face, is designed to discriminate against interstate commerce. Moreover, the Act negatively impacts energy production and costs in other States and penalizes States like Texas, Louisiana, Oklahoma, North Dakota, West Virginia, and Pennsylvania, among many others, that rely heavily on the energy sector. Likewise, the Act infringes on the foreign Commerce Clause by discriminating against the important economic interests of foreign commerce in the energy trade, negatively impacting U.S. trading partners, including foreign state-owned energy companies, and inhibiting the federal government's ability to speak with one voice on the issue of foreign trade of energy products.

11.    *Fifth*, the Act imposes an excessive fine in violation of the Eighth Amendment to the U.S. Constitution. The Constitution prohibits the government from imposing excessive fines as a form of punishment. *See, e.g.*, *Austin v. United States*, 509 U.S. 602, 609-10 (1993). But that

is exactly what the Act does—it punishes covered energy producers for greenhouse gas emissions generated by third parties related to the lawful (indeed, *essential*) production and use of the producers' products and those emissions' purported impacts on climate change. And the amount of the penalty is unconstitutionally excessive, particularly as the Act calls for the collection of $75 billion without any effort to link the supposed effects of climate change to a specific recovery—subjecting energy producers to hundreds of millions or even billions of dollars in penalties purportedly for greenhouse gases emitted over the course of nearly three decades when in reality there is absolutely no factual link between that period and the cost recovery amount.

12.    *Sixth*, the Act effects an unconstitutional taking in violation of the Fifth Amendment to the U.S. Constitution. Even where a law does not involve a physical taking, it can go "too far" so as to amount to an unconstitutional taking. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (citation omitted). The Act's retroactive penalties result in a substantial economic impact on covered energy producers, significantly interfering with those producers' investment-backed expectations, and are the result of a targeted effort to unfairly place covered energy producers on the hook for global greenhouse gas emissions and their purported impact on New York. *See E. Enters.*, 524 U.S. at 528-29 (plurality opinion).

13.    For these reasons and more, this Court should enjoin Defendants from enforcing the Act against Plaintiffs' covered members and declare the Act unlawful.

## PARTIES & STANDING

14.    Plaintiff the Chamber of Commerce of the United States of America ("the Chamber") is the world's largest business federation. The Chamber represents 300,000 direct members and indirectly represents the interests of more than three million businesses and organizations. An important function of the Chamber is to represent the interests of its members in matters before

Congress, the Executive Branch, and the courts. To that end, the Chamber regularly participates in cases that raise issues of vital concern to America's business community.

15.    Plaintiff American Petroleum Institute ("API") is a national, not-for-profit trade association representing all segments of America's oil and natural gas industry. API's approximately 600 members support more than 11.3 million jobs and produce, process, and distribute most of our nation's energy. API's members range from the largest integrated companies to the smallest independent energy producers. API's members include producers, refiners, suppliers, marketers, pipeline operators, and marine transporters, as well as service and supply companies that support the industry. API was formed in 1919 as a standards-setting organization. In its over 100 years, API has developed more than 800 standards to enhance operational and environmental safety, efficiency, and sustainability.

16.    Plaintiff National Mining Association ("NMA") is a national trade association that serves as the voice of the mining industry. NMA's members produce most of America's coal, metals, and industrial and agricultural minerals. NMA represents over 250 members involved in every aspect of mining, from producers and equipment manufacturers to service providers, including nearly every major coal company operating in the United States. America's mining industry supplies the essential materials necessary for nearly every sector of our economy—from technology and healthcare to energy, transportation, infrastructure, and national security—all delivered under world-leading environmental, safety, and labor standards. NMA works to ensure America has secure and reliable supply chains, abundant and affordable energy, and the American-sourced materials necessary for U.S. manufacturing, national security, and economic security. A core mission of the NMA is working with Congress and regulators to advocate for public policies that will help

America fully and responsibly utilize its vast natural resources. NMA also has a long history of representing the mining industry in front of the judiciary.

17.    Plaintiff The Business Council of New York State, Inc., ("BCNYS") is the largest statewide, industry-wide employer association in New York, representing more than 3,300 private sector businesses and business groups. BCNYS's mission is to advance economic growth, creating good jobs and strong communities across New York State. One of BCNYS's key functions is to advocate for its members' interests before the state legislature and regulatory agencies, with occasional federal and municipal advocacy as well. Over the years, BCNYS has participated in multiple legal actions, most often filing amicus curiae briefs in support of litigation with significant and/or widespread impact on its members.

18.    Plaintiffs have associational standing to bring their challenge because: (1) at least one of their members has individual standing to sue in its own right; (2) challenging the Act is germane to the Plaintiffs' respective purposes; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 117-18 (2d Cir. 2025). An order enjoining Defendants from enforcing the Act against Plaintiffs' covered members would redress the harm to those members of being forced to pay cost recovery demands under the Act.

19.    At least one of Plaintiffs' members has individual standing to sue in its own right. *See Do No Harm*, 126 F.4th at 117-18 (elements of individual standing). Although Plaintiffs' members reserve all rights, claims, and defenses in relationship to the Act,[4] Plaintiffs appear before this

---

[4] Specifically, Plaintiffs' members expressly reserve the right to argue, among other contentions, that they are not "[r]esponsible part[ies]" under the Act because they "lack[] sufficient contacts with the state to satisfy the due process clause of the United States Constitution." § 76-0101(21). Were New York to bring an action against Plaintiffs' members under the Act, the

Court for the limited purpose of challenging the Act and New York's intention to seek cost recovery demands from at least some of Plaintiffs' members. The Act's legislative history, statements by the Act's sponsors, and previous actions by New York make clear that New York intends to apply the Act to one or more of Plaintiffs' members. For example, a memorandum circulated by the Act's sponsors provides an "Approximate List of Covered Companies under the Climate Change Superfund Act," which lists "Exxon Mobil," "Shell," "BP," "Chevron," "Peabody," "Arch Coal," "CONSOL Energy,"[5] and "Alliance Res[ource] P[artners]," among many other oil, gas, and coal companies that are also members of one or more Plaintiffs. Memorandum from Sen. Liz Krueger and Assm. Jeffrey Dinowitz to Interested Parties at 1-2 (Oct. 20, 2023), https://perma.cc/L8DP-M3AX ("Covered Companies Memorandum"); *see infra* ¶ 75. Other statements in the legislative history reference those same energy producers. *See infra* ¶ 76. Moreover, the New York Senate issued a press release when Governor Hochul signed the legislation referring to "Big Oil" and specifically referencing Exxon. *See infra* ¶ 76.

20.    Therefore, among other entities, Defendants are likely to target the following energy producers for cost recovery demands: Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, BP America, Inc., Peabody Energy, Core Natural Resources, and Alliance Resource Partners. Each of these producers is therefore injured by the Act—New York has made clear that it will issue them cost recovery demands for hundreds of millions or billions of dollars to pay their allotted share of the total $75 billion liability and they will be forced to expend time and resources to argue that they do not owe any money to New York under the unlawful Act in defending against

---

members, who are not named parties or signatories to the complaint, reserve the right to raise that argument and other jurisdictional defenses, which they do not waive.

[5] On January 9, 2025, Arch Coal and CONSOL merged and are now one company—Core Natural Resources. *See* News Releases: Arch Resources and CONSOL Energy Announce Stockholder Approvals in Respect of Pending Merger (Jan. 9, 2025), https://perma.cc/XN8S-YYM8.

a cost-recovery demand. Each producer has standing in its own right. Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, and BP America, Inc. are members of both the Chamber and API; Exxon Mobil Corporation and BP America, Inc. are likewise members of BCNYS. Peabody Energy, Core Natural Resources, and Alliance Resource Partners are members of NMA.

21.    Another of BCNYS's members, Revere Copper, also has standing to sue in its own right. Revere is a more than 200-year-old business, headquartered in Rome, New York, making it one of the nation's oldest manufacturing companies, and one of the finest copper manufacturers in the world, employing more than 370 New Yorkers. To satisfy a growing demand for copper, Revere invested $30 million between 2023 and 2024 and will invest over $25 million in 2025, all toward projects to increase production capacity. In 2023, Revere installed an electric furnace in Rome, New York to give it added melting capacity of 20 million lbs. Revere Copper has also expanded its copper operations outside of New York, building a new state-of-the-art plant in Mebane, North Carolina, in 2023 because of its proximity to the Electric Vehicle ("EV") industry in that area. In addition to the EV market, Revere serves multiple industries, including renewable energy, electrical, medical, HVAC (heating, ventilation, and air conditioning), and others. As Revere is an energy-intense producer of commodity metal products, production costs are a significant competitiveness issue, especially costs of natural gas and electric power. New York's Act has the potential to significantly increase energy costs, which could make energy less affordable and less available for Revere, harming its business.

22.    Challenging the Act is germane to the purposes of the Chamber, API, NMA, and BCNYS. All Plaintiffs represent their members in challenging laws that negatively impact their members' businesses, including laws related to environmental issues and laws that impose unreasonable and unlawful financial and regulatory burdens upon the private sector. The Chamber,

through its Litigation Center, "fights for business at every level of the U.S. judicial system, on virtually every issue affecting business, including . . . energy and environment [and] . . . preemption." Chamber Litigation Center, U.S. Chamber of Com. (2024), https://perma.cc/XS6S-MPTC. For example, the Chamber recently brought a lawsuit against California on behalf of its members, challenging the State's law requiring companies to make statements of opinion about their greenhouse gas emissions. *See* Complaint, *Chamber of Com. of the U.S. v. Cal. Air Res. Bd.*, No. 2:24-cv-00801 (C.D. Cal. Jan. 30, 2024). The Chamber also files amicus briefs in a wide range of suits, including environmental litigation, throughout the country on behalf of its members. *See, e.g.*, Brief for the Chamber of Com. of the U.S. as Amicus Curiae, *Friends of the Earth v. Haaland*, Nos. 22-5036, 22-5037 (D.C. Cir. June 13, 2022). Likewise, API "represent[s] the [energy] industry in legal proceedings." About API, API (2024), https://perma.cc/FL5G-WGCU. And API also files amicus briefs in environment-related litigation on behalf of its members. *See, e.g.*, Brief for the Am. Petrol. Inst. et al. as Amici Curiae, *Cal. Cmtys. Against Air Toxics v. EPA*, Nos. 24-1180, 24-1178 (D.C. Cir. Oct. 25, 2024). So too does NMA. NMA, who is the only national trade organization for the mining industry, files cases and amicus briefs on behalf of its members. *See, e.g.*, Petition for Review, *NMA v. EPA*, No. 23-1199 (D.C. Cir. July 29, 2023) (lawsuit challenging EPA's Ozone Transport Rule); Petition for Review, *NMA v. EPA*, No. 24-1124 (D.C. Cir. May 9, 2024) (lawsuit challenging EPA's Clean Power Plan); Brief for the Chamber of Com. et al. as Amici Curiae, *Diamond Alt. Energy, LLC. v. EPA*, No. 24-7 (Sup. Ct. Feb. 3, 2025) (brief amici curiae joining the Chamber and others). And BCNYS boasts a legal center that serves as a legal arm for members and "represent[s] the broad views of the business community in important litigation throughout the state and federal appellate courts." Legal Center, The Bus. Council of N.Y. State,

Inc. (2025), https://perma.cc/ZY5H-4SCX; *see* Brief for The Bus. Council of N.Y. State, Inc., as Amicus Curiae, *People v. Sprint Nextel Corp.*, 26 N.Y.3d 98 (N.Y. Ct. App. July 21, 2015).

23.     Plaintiffs bring a purely legal challenge to the Act and are seeking only declaratory and injunctive relief; no individual member participation is necessary.

24.     Defendant Letitia James is the New York Attorney General. In her capacity as New York Attorney General, Defendant James is responsible for implementing and enforcing the Act. § 76-0103(8). Defendant James is sued in her official capacity.

25.     Defendant Sean Mahar is the Interim Commissioner of the New York Department of Environmental Conservation. In his capacity as Interim Commissioner of the New York Department of Environmental Conservation, Defendant Mahar is responsible for implementing and enforcing the Act. § 76-0103(8); *see also* § 1-0303(4), (11). Defendant Mahar is sued in his official capacity.

## JURISDICTION & VENUE

26.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and pursuant to its equity jurisdiction and *Ex parte Young*, 209 U.S. 123 (1908), *see Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016); injunctive relief under 28 U.S.C. § 1651; and declaratory relief under 28 U.S.C. § 2201(a).

27.     This Court has personal jurisdiction over Defendants because they reside in or conduct a substantial proportion of their official business in New York. Venue is proper in this District under 28 U.S.C. § 1391(b) because at least one Defendant resides in this District, and Defendants' conduct giving rise to this civil action occurs in this District.

28.     Specifically, Defendant James resides in this District for purposes of venue because the New York Attorney General's Office maintains one of its principal offices in this district, as

Defendant James has recognized in other cases. *See People v. Austin*, No. 451533/2019, 2021 WL 325557, at *3 (N.Y. Sup. Ct. Jan. 29, 2021) ("[T]he Attorney General's principal office is located in Manhattan."); Plaintiff's Memorandum in Opposition to Defendants' Motion to Transfer, *New York v. Amazon.com Inc.*, No. 21-cv-01417, 2021 WL 12185065 (S.D.N.Y. Mar. 10, 2021) (Defendant James arguing in favor of venue in the Southern District of New York and against transfer to the Eastern District of New York because "[t]he Southern District is the Attorney General's 'home forum,'" and "[t]herefore venue is proper in New York County because plaintiff maintains one of its principal offices in Manhattan"); Memorandum of Law in Support of Attorney General's Motion to Dismiss the Complaint or, Alternatively, to Transfer Venue at n.10-11, *Libertarian Party of Erie Cnty. v. Cuomo*, No. 15-cv-00654, 2015 WL 7587626 (W.D.N.Y. Nov. 6, 2015) (former New York Attorney General Schneiderman arguing that "[t]he Attorney General also maintains executive offices in New York City, in the Southern District of New York. . . . [I]f the Court decides to transfer this action, transfer to the Southern District of New York also would be appropriate"). The New York Attorney General's Office maintains and accepts service of process at its "Managing Attorney's Office" located at 28 Liberty Street, 16th Floor, New York, NY 10005. *See* Serve Papers on the Office of the New York State Attorney General, N.Y. State Att'y Gen., https://perma.cc/A5VQ-MJJP. And Defendant James also regularly files lawsuits in this District from her office located at 28 Liberty Street, which is located within this District. *See, e.g.*, Complaint at 41, *New York v. Trump*, No. 20-cv-05770 (S.D.N.Y. July 24, 2020); Complaint at 30, *New York v. Wolf*, No. 20-cv-01127 (S.D.N.Y. Feb. 10, 2020).

## BACKGROUND

29.    **Energy Production in the United States.** The Chamber's, API's, NMA's, and BCNYS's members include the United States' largest energy producers. These members lawfully provide energy that the vast majority of Americans use every day as well as jobs for millions of

Americans. *See, e.g.*, U.S. Oil and Natural Gas Report Fact Sheet, U.S. Dep't of Energy (Oct. 2020), https://perma.cc/6NSA-VA47; How Many Jobs Has the Oil and Natural Gas Industry Created?, API (2024), https://perma.cc/5N2F-2ZWV; Short-term Energy Outlook, U.S. Energy Info. Admin. (Feb. 11, 2025), https://perma.cc/XR8E-FCC9 (noting that coal supplied 16% of U.S. electricity last year and is expected to continue to supply between 15% and 16% in 2025). Fossil fuels continue to account for approximately 80% of all energy sources in the United States. *See* Monthly Energy Review January 2025 at 3, U.S. Energy Info. Admin. (Jan. 2025), https://perma.cc/6ZVB-44PF.

30.    For example, oil and gas producers provide energy for all manner of transportation in the United States and around the world, ranging from gasoline and diesel for motor vehicles to fuel for tractor trailers and aircraft that transport goods throughout the country and globally. *See, e.g.*, Use of Energy Explained: Energy Use for Transportation, U.S. Energy Info. Admin. (Aug. 16, 2023), https://perma.cc/XZ45-TJL9.

31.    The refining process that ostensibly will be the subject of New York's penalties also creates many important by-products that are used throughout the United States, including smart phones, laptops, clothing (synthetic fibers), glasses, tires, roads, vehicle batteries, sulfur (for lithium mining and fertilizers), plastics (used in medical equipment, toys, and bottles), waxes, asphalt, and lubricants. *See* Products Made From Oil and Natural Gas, U.S. Dep't of Energy, https://perma.cc/6F54-87Z2; Hydrocarbon Gas Liquids Explained, U.S. Energy Info. Admin. (Dec. 26, 2023), https://perma.cc/Y73W-EHPZ; Oil and Petroleum Products Explained, U.S. Energy Info. Admin. (June 20, 2024), https://perma.cc/ZF3L-DNZY. Moreover, natural gas provides cost-effective energy for homes and businesses throughout the country, accounting for 30% of energy used in the United States. Natural Gas Fuel Basics, U.S. Dep't of Energy,

https://perma.cc/SPW9-BQH7. "About 40% of the fuel goes to electric power production and the remainder is split between residential and commercial uses, such as heating and cooking, and industrial uses." *Id.* Globally, natural gas accounted for 22.3% of total electricity generation in 2022. World: Natural Gas Supply, Int'l Energy Agency, https://perma.cc/364G-2CSR.

32. Likewise, the U.S. coal industry is a vital source of reliable, affordable energy and a key input for steel production. That is why Congress has stated that it is "essential to the national interest to ensure the existence of an expanding and economically healthy underground coal mining industry." 30 U.S.C. § 1201(b). The United States is home to the largest reserves of coal in the world. *See* International: Coal Reserves 2023, U.S. Energy Info. Admin., https://perma.cc/M3HN-N7KM. And U.S. coal producers are uniquely positioned to respond to the world's ongoing, record-breaking coal consumption, which again hit an all-time high of 8.7 billion metric tons in 2024. *See* Global Coal Demand Is Set to Plateau Through 2027, Int'l Energy Agency (Dec. 18, 2024), https://perma.cc/DDH2-7KV7. Coal currently accounts for 15 percent of U.S. electricity generation. Electric Power Monthly: Table 1.1. Net Generation by Energy Source: Total (All Sectors), 2014-November 2024, U.S. Energy Info. Admin., https://perma.cc/RTV7-4H55. It is the leading source of electricity generation in nine states, Electric Power Monthly: Table 1.4.B. Utility Scale Facility Net Generation from Coal, U.S. Energy Info. Admin., https://perma.cc/W52A-NL76. While some states have closed coal plants, an increasing number of states have paused planned closures of coal plants in order to keep the lights on in a time when electricity demand is rapidly growing. Metallurgical coal "is used to produce coke, an integral component used in steelmaking," and "[a]round 1 billion tons of metallurgical coal are used in global steel production a year, which accounts for 15 percent of total coal consumption worldwide." Strengthening America's Infrastructure: Metallurgical Coal, NMA, https://perma.cc/ERM6-35FL.

33.     Although these energy producers—like any other critical industry in the United States—are subject to a variety of government regulations, the work that they do is not only lawful but has long been encouraged and incentivized by the federal and State governments. *See, e.g.*, *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020) ("The government affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land."); Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025) ("It is the policy of the United States . . . to encourage energy exploration and production on federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future."); Natural Gas Laws and Incentives, U.S. Dep't of Energy, https://perma.cc/8SD5-PUNB; Federal Financial Interventions and Subsidies in Energy in Fiscal Years 2016-2022, U.S. Energy Info. Admin. (Aug. 2023), https://perma.cc/QVT7-HD7C; New York State Strategic Fuel Reserve, N.Y. State Energy Rsch. & Dev. Auth. (2025), https://perma.cc/D34G-A4KJ; Carl Campanile, *Hochul Approves More Natural Gas Pumping to Meet Cold-Weather Demand Despite NY's Green Push – and Con Ed's Proposed Hikes*, N.Y. Post (Feb. 16, 2025), https://perma.cc/8NFC-FYVC. President Trump also recently declared a national energy emergency, noting that "energy security is an increasingly crucial theater of global competition" and that "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." Exec. Order No. 14,156, 90 Fed. Reg. 8433 (Jan. 20, 2025). The order also specifically notes that the problems with energy security are most pronounced in the Northeast, where New York and Vermont reside. *See id.*

34.     New York is one of the United States' largest consumers of oil and gas overall. New York State Profile and Energy Estimates, U.S. Energy Info. Admin. (Jan. 16, 2025),

https://perma.cc/5TWE-APRG ("New York State Profile"). The vast majority of New York's total energy consumption comes from oil and gas. *See* New York State Profile and Energy Estimates: Profile Overview, U.S. Energy Info. Admin. (Jan. 16, 2025), https://perma.cc/FB2J-EMHR. Moreover, in 2022, "New York [was] the fourth-largest consumer of both motor gasoline and jet fuel." New York State Profile, https://perma.cc/5TWE-APRG. "One in five New York households heat with petroleum products, primarily heating oil." *Id.*[6] "[S]ix out of every ten [New York] households heat with natural gas." *Id.* And recent statistics show that consumption of fossil fuel energy products is *increasing* in New York, not decreasing: "In 2021, statewide petroleum products consumption increased 12.9% compared to 2020." New York State Energy Consumption, N.Y. State Energy Rsch. & Dev. Auth. (2007 to 2021 Data), https://perma.cc/XKU6-ZEAL. New York is also "the sixth-largest natural gas consumer among the states." New York State Profile, https://perma.cc/5TWE-APRG. In the State of New York, as of November 2024, 46.16% of the state's electricity was generated from natural gas. *See* Electricity Generation by State, Choose Energy (Feb. 7, 2025), https://perma.cc/YZ8X-BKLZ.

35.     The New York government has also used (and continues to extensively use) fossil fuels other than coal. For example, although New York Governor Kathy Hochul issued an executive order in 2022 directing state agencies to adopt sustainability and decarbonization programs, many of those requirements did not have to be completed for many years. Gov. Kathy Hochul, Exec. Order No. 22: Leading By Example: Directing State Agencies to Adopt a Sustainability and Decarbonization Program (Sept. 20, 2022), https://perma.cc/3PC7-JHYJ. Among other things, this Executive Order directed State agencies, by January 1, 2024, to "avoid infrastructure, building

---

[6] For perspective, that is about 1,533,791 households across New York. *See* Quick Facts New York, U.S. Census Bureau, https://perma.cc/94YT-A5T7 (7,668,956 total households in New York).

systems or equipment that can be used for the combustion of fossil fuels," but this directive excluded "the necessary use for backup emergency generation and process loads." *Id.* The Executive Order also directed state agencies to transition government automobile fleets to zero-emission vehicles, but those requirements do not have to be completed until 2035 for light-duty non-emergency vehicle fleets and 2040 for medium- and heavy-duty vehicle fleets. *Id.* This means that New York continues to use fossil fuels other than coal for transportation and will do so for years to come. New York also maintains a strategic reserve fossil fuel plan. As noted by New York State itself, that strategic reserve is necessary because "New York State relies on the continuous availability and resupply of gasoline and diesel fuel to maintain public safety, commerce, and the well-being and economic vitality of its residents, businesses, and governments." *See* New York State Strategic Fuel Reserve, N.Y. State Energy Rsch. & Dev. Auth. (2025), https://perma.cc/95N2-QEW8. And just this month, the New York Department of Environmental Conservation "approved permits to expand the capacity of the 414-mile Iroquois pipeline and pump more natural gas into New York City and southern Connecticut in a move to maintain adequate supply during the coldest days of the year — and avoid freezeouts." *See* Campanile, *supra* ¶ 33; Iroquois Enhancement by Compression (ExC) Project, N.Y. Dep't of Env't Conservation, https://perma.cc/2S3C-P5ES (linking to permits and related documentation).

36.     While New York relies heavily on oil and gas, New York has cut back on coal usage in the last decade. "Coal, which accounted for 10% of the state's electricity net generation in 2010, no longer fuels any of New York's in-state net generation." New York State Profile, https://perma.cc/5TWE-APRG. New York's "last coal-fired power plant closed in 2020." *See id.* And, in 2023, "New York was one of nine states that did not have any utility-scale coal-fired electricity generation." *See id.*

37.    **Greenhouse Gas Emissions and Climate Change.** Greenhouse gas emissions are produced by many different sources, including combustion of fossil fuels, deforestation, livestock farming, use of fertilizers, landfills, and hydrofluorocarbons found in everyday products like aerosol sprays and air conditioners. *See* Sources of Greenhouse Gas Emissions, EPA (Jan. 16, 2025), https://perma.cc/CA2M-2ZGX; *see also* Background on HFCs and the AIM Act, EPA (Feb. 13, 2025), https://perma.cc/FT3W-K9H9 (under the Kigali Amendment to the Montreal Protocol and the American Innovation and Manufacturing ("AIM") Act, the United States is phasing down the production and consumption of listed hydrofluorocarbons ("HFCs")). Greenhouse gas emissions are also produced by many normally occurring environmental sources. For example, methane is "emitted from a number of natural sources," ranging from "[n]atural wetlands" to "termites, oceans, sediments, volcanoes, and wildfires." Overview of Greenhouse Gases: Methane Emissions, EPA (Jan. 16, 2025), https://perma.cc/NXT7-FEQD.

38.    The vast majority of greenhouse gas emissions that come from the use of fossil fuels are the result of fossil fuels' end use, such as combustion emissions from driving a car or heating a home. *See* Fast Facts on Transportation Greenhouse Gas Emissions, EPA (June 18, 2024), https://perma.cc/MVK9-5B6Y ("[T]ransportation accounted for the largest portion (28%) of total U.S. GHG emissions in 2022. Cars, trucks, commercial aircraft, and railroads, among other sources, all contribute to transportation end-use sector emissions."); Energy and the Environment Explained: Where Greenhouse Gases Come From, U.S. Energy Info. Admin. (June 18, 2024), https://perma.cc/G94Y-P7ZU (explaining that "*[c]onsumption* of fossil fuels accounts for most of

the energy-related $CO_2$ emissions of the major energy-consuming sectors: commercial, industrial, residential, transportation, and electric power" (emphasis added)).[7]

39.     The Chamber, API, NMA, BCNYS, and their members support actions to help address climate change, including reducing greenhouse gas emissions. *See* The Chamber's Climate Position: 'Inaction is Not an Option,' U.S. Chamber of Com. (Oct. 27, 2021), https://perma.cc/5ASH-XJR3 ("[T]he climate is changing, humans are contributing to these changes, and inaction is not an option. . . . We support market-based solutions to reduce emissions and support U.S. competitiveness, national security, and American workers."); Climate Change, API (2024), https://perma.cc/JUE4-WSJ2; NMA Climate Change Position, NMA (2025), https://perma.cc/NE37-NBTU ("The mining industry continues to proactively undertake efforts to protect the environment, including measuring and reducing its carbon footprint through continual investment in and implementation of technology solutions, energy conservation and efficiency programs.").

40.     The federal government is addressing climate change through the reduction of greenhouse gas emissions in a variety of ways. For example, the Environmental Protection Agency ("EPA") measures and monitors greenhouse gas emissions from emissions sources, and it "works with industry and others to reduce greenhouse gas emissions through regulatory initiatives and partnership programs." What EPA Is Doing About Climate Change, EPA (Feb. 13, 2025), https://perma.cc/36CM-7RBA; *see also* Climate Change Regulatory Actions and Initiatives, EPA

---

[7] Indeed, the Act implicitly recognizes this fact by attempting to hold covered energy producers strictly liable "based on the amount of historic greenhouse gas emissions attributable to greenhouse gas-producing fossil fuels which they are responsible for extracting and refining, *because the use of products derived from such fossil fuels caused such pollution*." SB824 § 1(5) (emphasis added). But the Act places no responsibility on any of the countless entities and other consumers, including the State of New York and its agencies and employees, that use such products daily.

(Jan. 22, 2025), https://perma.cc/QB8K-AQJD (listing various regulatory actions to monitor or reduce greenhouse gas emissions taken by EPA); Greenhouse Gas Emissions Continue to Decline as the American Economy Flourishes Under the Trump Administration, EPA (Nov. 9, 2020), https://perma.cc/2EYZ-HJPF (touting reduction in greenhouse gas emissions under EPA's Greenhouse Gas Reporting Program). In addressing climate change and greenhouse gas emissions, the federal government balances those issues with comparably important issues of national energy production, economic stability, and national security. *See, e.g.*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 427 (2011) ("*AEP*") ("Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance."); Exec. Order No. 14,154 ("It is . . . in the national interest to unleash America's affordable and reliable energy and natural resources."); Exec. Order No. 14,156 ("[The United States] need[s] a reliable, diversified, and affordable supply of energy to drive our Nation's manufacturing, transportation, agriculture, and defense industries, and to sustain the basics of modern life and military preparedness.").

41.     Greenhouse gases are emitted from billions of individual sources across the globe into the atmosphere and many countries have chosen not to impose environmental regulations designed to minimize emissions from these sources. The migration and impact of these emissions, however, are complex issues. Once released, greenhouse gases quickly disperse and "become well mixed in the atmosphere." *AEP*, 564 U.S. at 422 (citation omitted); *see also City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 472 (S.D.N.Y. 2018) (climate-change claims "are ultimately based on the 'transboundary' emission of greenhouse gases"), *aff'd sub nom. City of New York*, 993 F.3d at 81. The United States stated as much before the International Court of Justice: "Because [greenhouse gases] from every particular source mix in the atmosphere with emissions from innumerable

22

other sources, global effects cannot be linked to the location of any particular source of emissions." Int'l Court of Justice, Request by the United Nations General Assembly for an Advisory Opinion, Written Statement of the U.S., at 67 (Mar. 22, 2024).

42.    Therefore, it is impossible to measure accurately and fairly the impact on a specific state of greenhouse gas emissions from fossil-fuel consumption attributable to a particular entity in a particular location impacting a certain state over the course of a specific 25-year period.

43.    As the Second Circuit has stated, "Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere. However, because of their rapid and widespread global dispersal, greenhouse gas emissions from each of [the Producers'] fossil fuel products are present in the atmosphere in New York State." *City of New York*, 993 F.3d at 92 (internal record citation omitted). That is why, as the Supreme Court has recognized, "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422.

44.    Further complicating matters is how greenhouse gas emissions are related to climate change. Individual sources of greenhouse gas emissions themselves do not cause measurable climate impacts. Rather, as the Supreme Court has summarized, it is the cumulative effect of historical global greenhouse gas emissions over many decades—from many different natural and human sources—that can cause a "greenhouse" effect that warms the earth's atmosphere, contributing to different climate impacts. *See Massachusetts v. EPA*, 549 U.S. 497, 504-05 (2007).

45.    Indeed, it is impossible to attribute the alleged impacts of climate change in specific geographic regions to particular sources or categories of greenhouse gas emissions with any accuracy or fairness (especially when those emissions are confined to a specific, decades-long timeframe).

46.    Even if New York could accurately estimate the price of climate mitigation measures it has taken in the past or plans in the future, that does not mean that New York can—with any accuracy—equitably assess what sources of global greenhouse gas emissions have had an impact on the State, where those emissions originated from, how much those specific emissions have affected the State, or how much of the impact to the State is attributable to climate change.

47.    This is especially true where New York's Act imposes liability for presumptive impacts purportedly caused by greenhouse gas emissions over a 25-year period beginning in 2000 but not before or after that 25-year period. Attempting to isolate the effects of greenhouse gas emissions during that timeframe (versus before and after) and differentiating between impacts purportedly caused by greenhouse gas emissions before 2000 versus after 2024 exacerbates the difficulty in attributing specific climatological events to specific emissions sources.

48.    New York's inability to fairly assess the purported impacts of greenhouse gas emissions on the state is also reflected in the arbitrary selection of a $75 billion as the total penalty that covered energy producers must pay. As explained below, the New York legislature essentially pulled this number out of thin air, *see infra* ¶ 164, demonstrating that New York cannot even, with any accuracy or fairness, calculate the purported impact of greenhouse gas emissions on the State.

49.    For these reasons, among others, a State like New York cannot, with any accuracy or fairness, attribute specific impacts on specific geographic areas purportedly caused by climate change during a defined 25-year period to atmospheric greenhouse gases emitted by any particular source.

50.    **New York Targets Out-of-State Energy Producers for Greenhouse Gas Emissions Liability, Implicating the Sovereign Interests of Other States.** Although New York and its residents *consume* large quantities of fossil fuels and are deeply dependent on petroleum

products, *see supra* ¶ 34, New York is home to few traditional energy producers or refiners. Like-wise, "New York does not have any coal mines or economically recoverable coal reserves." New York State Profile, https://perma.cc/5TWE-APRG. And New York imports almost all its energy products from other States and from outside the United States. Specifically, "[c]rude oil refineries in New Jersey and Pennsylvania, refined product pipelines from the Gulf Coast and the Midwest, and imports, mostly from Canada, provide the petroleum products consumed in New York." *Id.* And the "largest share" of natural gas "comes through and from Pennsylvania." *Id.*

51.     By contrast, New York favors in-state renewable energy producers, which compete with fossil fuel producers as sources of energy. "New York generates more power from renewable resources than any other state east of the Mississippi River." *Id.* This includes being "consistently among the nation's top producers of hydroelectricity," ranking "fourth in the nation in electricity generation from small-scale solar," and having "wind-powered electricity" as the "state's third-largest source of renewable electricity generation." *Id.* "New York adopted its first renewable port-folio standard (RPS) in 2004," and in 2015, "New York replaced its RPS with the state's Clean Energy Standard (CES)." *Id.* The current CES "requires 70% renewable electricity by 2030 and 100% carbon-free electricity by 2040." *Id.*

52.     This makes New York quite different from other States across the country that de-pend largely on production from traditional energy sources like petroleum, natural gas, or coal for jobs and economic growth, such as Texas, Louisiana, Oklahoma, North Dakota, West Virginia, and Pennsylvania, among many others.

53.     Texas "leads the nation in energy production, providing about one-fourth of the country's domestically produced primary energy." Texas State Profile and Energy Estimates, U.S. Energy Info. Admin. (July 18, 2024), https://perma.cc/QL2J-W7T2. "Texas produces more crude

oil than any other state and accounted for more than two-fifths (43%) of the nation's production from both onshore and offshore areas in 2023." *Id.* Texas also "has one-fourth of the nation's operable crude oil refineries and about one-third of the total U.S. refining capacity." *Id.* Moreover, "[o]ne-fourth of U.S. proved natural gas reserves and about 30 of the nation's 100 largest natural gas fields are located, in whole or in part, in Texas." *Id.* Texas is also the second largest lignite (the type of coal used almost exclusively for power generation) producer in the nation. *Id.*

54.     Louisiana "ranks among the top 10 states in both crude oil reserves and crude oil production and accounts for about 1% of both U.S. total oil reserves and production," and the State's "15 oil refineries account for about one-sixth of the nation's refining capacity and can process almost 3 million barrels of crude oil per calendar day." Louisiana State Profile and Energy Estimates, U.S. Energy Info. Admin. (Aug. 15, 2024), https://perma.cc/B62L-6G9N. Louisiana also "has the third-highest marketed natural gas production and the seventh-highest natural gas reserves among the states." *Id.* And while Louisiana produces a small amount of coal, it hosts the nation's third-largest coal exporting port. *Id.*

55.     Oklahoma is home to "[a]ll or part of about 15 of the nation's largest natural gas fields," and "[i]n 2023, [it] was the sixth-largest producer of marketed natural gas and accounted for 7% of the U.S. total." Oklahoma State Profile and Energy Estimates, U.S. Energy Info. Admin. (July 18, 2024), https://perma.cc/2RJD-M9SA. That same year, "Oklahoma produced about 157 million barrels of crude oil, the fifth-largest amount among the states, and accounted for about 3.3% of the nation's total annual crude oil production." *Id.* And "Oklahoma's 5 crude oil refineries have a combined processing capacity of about 547,000 barrels per calendar day, which is about 3% of the U.S. total refining capacity." *Id.* Oklahoma also has one active coal mine that produced about 2,000 tons of bituminous coal in 2022. *Id.*

56.    North Dakota is "the third-largest crude oil producer in the nation and has significant coal and natural gas reserves." North Dakota State Profile and Energy Estimates, U.S. Energy Info. Admin. (Aug. 15, 2024), https://perma.cc/DTE6-3A4B. North Dakota also produces about one trillion cubic feet of natural gas per year, reaching "a record high of nearly 1.2 trillion cubic feet in 2023." *Id.* North Dakota is also "the seventh-largest coal-producing state in the nation and accounts for about 4% of U.S. total coal output." *Id.*

57.    West Virginia "is the nation's fifth-largest energy producer, with substantial fossil fuel energy reserves and renewable resources." West Virginia State Profile and Energy Estimates, U.S. Energy Info. Admin. (Feb. 20, 2025), https://perma.cc/ZG59-U66L. West Virginia "is the nation's fifth-largest producer of marketed natural gas," with the State's "total annual gross withdrawals of natural gas surpass[ing] 3 trillion cubic feet for the first time to reach a record of nearly 3.2 trillion cubic feet" in 2023. *Id.* In addition to natural gas, coal is also "a major contributor to [West Virginia's] economy," with West Virginia ranking as the "nation's second-largest coal producer" and accounting "for about 15% of U.S. coal production." Id. West Virginia also produces oil and has one oil refinery. *Id.*

58.    Pennsylvania "is a leading East Coast supplier of natural gas, coal, refined petroleum products, and electricity to the nation." Pennsylvania State Profile and Energy Estimates, U.S. Energy Info. Admin. (Jan. 16, 2025), https://perma.cc/P4TA-YTXB. "In 2023, Pennsylvania's annual marketed natural gas production accounted for about one-fifth of total U.S. gas output, making it the second-largest natural gas producer in the nation, after Texas." *Id.* That same year, "Pennsylvania's marketed natural gas production reached a new high of almost 7.6 trillion cubic feet." *Id.* Pennsylvania is also "the third-largest coal-producing state in the nation, after Wyoming

and West Virginia." *Id.* Pennsylvania also produces "modest amounts of crude oil—mainly paraffin-rich crude oil used for making lubricants." *Id.* And the State is home to three oil refineries. *Id.*

59.    Despite New York having little economic connection to traditional energy producers (except insofar as New York and its residents consume and use fossil-fuel products) and instead focusing its energy production efforts on renewable energy, it has decided to target traditional energy producers for significant and costly liability based almost entirely on the out-of-state conduct of producers, other businesses, and consumers. Greenhouse gas emissions are a global phenomenon, emitted from many different sources beyond the energy production industry. Thus, although greenhouse gas emissions are impossible to link from a particular source to a particular environmental impact, New York has nonetheless laid unique blame for their release (and their effect on climate change) on a select group of almost exclusively out-of-state energy producers.

60.    **New York's Penalizing of Energy Producers Has the Potential to Increase Costs for Businesses and Consumers in New York and Across the United States.** Energy producers are not the only ones harmed by New York's targeted penalties. By imposing substantial penalties on energy producers, New York's Act has the potential to harm businesses and consumers in New York and throughout the United States.

61.    Take BCNYS's member Revere Copper for example. Revere is the oldest manufacturing company in the country and serves multiple industries, including the EV market, renewable energy, electrical, medical, HVAC, and others. To support its commodity metal products operations, Revere relies heavily on energy products, especially natural gas and electrical power. That makes production costs a major concern and a significant competitiveness issue for Revere.[8]

---

[8] This is why Revere has been a long-time participant in Multiple Intervenors, a coalition of large industrial and commercial energy consumers who participate in utility rate cases and

Revere recently invested $30 million between 2023 and 2024, and will invest over $25 million in 2025, all toward projects that will increase production capacity.

62.    Given that New York's Act imposes $75 billion on energy producers on which Revere relies heavily, it and other companies, particularly in the manufacturing industry, have reason to be concerned about harm to their business caused by the Act. New York's Act has the potential to increase costs to consumers and businesses like Revere. That is true for New York companies and consumers and well as companies and consumers throughout the United States.

63.    **New York Follows Vermont's Lead in Penalizing Energy Producers for Global Greenhouse Gas Emissions.** In 2024, the Vermont Legislature enacted S.259 (Act 122), which it entitled "the Climate Superfund Act." The Governor allowed the bill to become law without his signature on May 30, 2024. The Act took effect on July 1, 2024. S.259 § 7.

64.    The Vermont law is designed to secure compensatory payments from responsible parties based on a standard of strict liability, and those payments are then paid into a fund to support the Vermont Agency of Natural Resources' ("Agency") "climate change adaptation projects." 10 V.S.A. § 597(1).

65.    Not to be outdone by Vermont, the New York State Legislature enacted S.2129B, which it entitled "the Climate Change Superfund Act." [9] The Governor signed the bill into law on

---

engage in other energy-related activities, About MI, Multiple Intervenors, https://perma.cc/6XHU-4B58, and in Plaintiff BCNYS.

[9] In enacting the laws, the Vermont and New York legislatures purportedly borrowed language from the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA," also known as "Superfund"), 42 U.S.C. §§ 9601 *et seq.* But the States' laws are entirely different from CERCLA. CERCLA requires all parties (from a wide variety of industries) who owned or operated a hazardous waste site or transported or disposed of particular hazardous substances to clean up (or pay for) the particular contamination at a particular site that has some nexus to their conduct or ownership. Moreover, costs recoverable under CERCLA must have been spent consistent with a "National Contingency Plan," which provides administrative processes to

December 26, 2024, on the condition of the New York State Legislature's passing certain chapter amendments.

66.    The New York State Legislature passed the chapter amendments on February 24, 2025, and the Governor signed those amendments into law February 28, 2025.

67.    Thus, the Act initially took effect on December 26, 2024, S.2129B § 8, and as of February 28, 2025, is effective as amended by Act S.824.

68.    The Chamber and API have filed a complaint challenging Vermont's law, raising many of the same arguments raised in this Complaint challenging New York's Act. *See* Complaint, *Chamber of Com. v. Moore*, No. 24-cv-01513 (Dec. 30, 2024). Both laws seek to hold largely out-of-state energy producers strictly liable for global greenhouse gas emissions and are unconstitutional.

## NEW YORK ACT

69.    The New York Act "establish[es] a climate change adaptation cost recovery program . . . that will require companies that," according to New York, "have contributed significantly to the buildup of climate change-driving greenhouse gases in the atmosphere to bear a proportionate share of the cost of infrastructure investments and other expenses necessary for comprehensive adaptation to the impacts of climate change." S.2129B § 2(4).

---

determine how to clean up a site. *See* 42 U.S.C. § 9607(a). By contrast, the States' laws are neither site-specific nor tied to specific entities associated with a specific polluted site and its contamination. Rather, the States' laws include a particularly glaring mismatch: They impose strict liability on a handful of energy producers for impacts felt anywhere in the State, purportedly caused by global greenhouse gas emissions from worldwide use of fossil fuels by countless individuals and entities, and use the penalties imposed on those few energy producers to fund future "[c]limate change adaptive infrastructure project[s]" all across the state. § 76-0101(3). Thus, while CERCLA requires remediation of specific polluted sites, the Vermont and New York laws punish a targeted handful of energy producers for global emissions produced by billions of actors around the world, and use the fines levied against those producers to fund a variety of the States' desired projects.

70.    **The Act Targets Only the Largest Energy Producers That Have Sufficient Contacts with New York in an Effort to Satisfy Due Process.** The Act applies to "responsible part[ies]," which it defines as "any entity (or a successor in interest to such entity described herein), which, during any part of the covered period, was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the [Department of Environmental Conservation] to be responsible for more than one billion tons of covered greenhouse gas emissions." § 76-0101(21).[10] Notably, the Act's definition fails to account for the vast majority of emitters of anthropogenic greenhouse gases—global end users.

71.    The Act's coverage definition "shall not include any person who lacks sufficient contacts with the state to satisfy the due process clause of the United States Constitution." *Id.* Consequently, even though the liability of the responsible parties has absolutely nothing to do with their contacts with the State, they are nonetheless on the hook merely by being subject to the state's jurisdictional reach, whereas other producers outside the state's long arm will be immune from the penalty.

72.    The Act's "[c]overed period means the period that began January first, two thousand and ended on December thirty-first, two thousand twenty-four." § 76-0101(9).[11]

73.    "Covered greenhouse gas emissions" means "with respect to any entity, the total quantity of greenhouse gas emissions, expressed in metric tons of carbon dioxide equivalent, as defined in section 75-0101 of this chapter, attributable to the total amount of fossil fuels extracted

---

[10] New York's Environmental Conservation Law defines "department" as used in the Act to mean "the State Department of Environmental Conservation." § 1-0303(11). Likewise, it defines "Commissioner" as used in the Act to mean "the state Commissioner of Environmental Conservation." § 1-0303(4).

[11] This covered period is one day shy of 25 years. Therefore, for ease of reference, this Complaint uses 25 years throughout when discussing the covered period.

by that entity during the covered period, as well as the total amount of crude oil refined by that entity during the covered period." § 76-0101(8). Importantly, the Act concedes that New York is attempting to impose liability for *global* greenhouse gas emissions beyond the State's borders: "For the purposes of this article, covered greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining worldwide by such entity and are not limited to such emissions within the state." § 76-0101(8). As noted above, the Act does not differentiate between greenhouse gases emitted during extraction and refining of fossil fuels and greenhouse gas emitted by the end users of fossil fuels.

74.     The Act does not list specific covered energy producers, but the Act's legislative history and statements issued by the Governor of New York when signing the law make clear that New York will issue cost recovery demands to one or more of the Chamber's, API's, NMA's, and BCNYS's members.

75.     *First*, the Act's sponsors in the New York State Legislature circulated a memorandum regarding the "Approximate List of Covered Companies under the Climate Change Superfund Act." Covered Companies Memorandum at 1; *see supra* ¶ 19. The memorandum contains a list of 38 companies that, according to the Act's sponsors, are purportedly "in the cohort of entities that have released more than 1 billion tons of CO2 in the prescribed period and have sufficient nexus with New York State such that the state could successfully enforce" a cost recovery demand issued under the law. *Id.* For that list of energy producers, the memorandum lists the purported total tons of greenhouse gas emissions attributable to each producer, the tons of emissions counted against each producer under the Act (i.e., those over one billion tons), each producer's percentage share of the total emissions counted under the law, and the anticipated penalties against each producer. *Id.* at 2. That memo names, among other energy producers, "Exxon Mobil," "Shell," "BP,"

"Chevron," "Peabody," and "Alliance Res[ource] P[artners]," as well as "Arch Coal" and "CON-SOL Energy" (now, Core Natural Resources) entities. *Id.*

76.     *Second*, other evidence in the legislative history of the Act shows that New York intends to target one or more of the Plaintiffs' members. Assemblymember Dinowitz stated during the legislative hearing on the Act that "Exxon Mobil, Shell, BP, [and] Chevron" would "have to participate" in paying penalties under the Act. N.Y. State Assemb., June 7, 2024 Chamber Debate, 2023-24 Legislative Session, at 3085 (June 7, 2024), https://perma.cc/UX7W-JSU7. Likewise, the official New York State Assembly memorandum in support of the Act specifically mentions "Chevron" and "ExxonMobil" in discussing their purported "capital investments in low-carbon sources" and their profits as justification for the Act's scheme. Memorandum from Assm. Jeffrey Dinowitz to New York State Assembly, Memorandum in Support of Legislation A3351B, https://perma.cc/L2D5-W8DL. Assemblymembers also discussed "oil and coal" generally, signal-ing the Act would target companies across the energy sector that refined oil, coal, and other fossil fuels. *See* N.Y. State Assemb., June 7, 2024 Chamber Debate, 2023-24 Legislative Session, at 353, 365 (June 7, 2024), https://perma.cc/UX7W-JSU7.

77.     *Third*, New York's Governor and Legislative Leaders issued a press release on De-cember 26 when Governor Hochul signed the bill into law that included statements that "[n]ow Big Oil will pay for much of the damages that they helped cause" and other comments targeted "fossil fuel companies," noting that they needed to "pay." Governor Kathy Hochul, Governor Hochul Signs Landmark Legislation Creating New Climate Superfund (Dec. 26, 2024), https://perma.cc/VH26-BWHB.

78.     In sum, without waiving any members' right to challenge that they are responsible parties covered by the Act, the State of New York and its leaders have made clear that the State

will seek to enforce the Act against, among other entities, the following energy producers: Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, BP America, Inc., Peabody Energy, Core Natural Resources, and Alliance Resource Partners. *See supra* ¶ 19 & note 4.

79. **The Act Imposes a Penalty on Out-of-State Energy Producers.** The Act imposes severe, retroactive, and arbitrary penalties on out-of-state energy producers through what the Act refers to as "cost recovery demand[s]." §§ 76-0101(7), 76-0103(2)(c).

80. Under the Act, the Department of Environmental Conservation issues "notice[s] of cost recovery demands"[12] to "responsible part[ies]," holding those responsible parties "strictly liable" for their purported share of greenhouse gas emissions and demanding payment to the State as punishment for that purported liability. §§ 76-0101(17), 76-0103(2)(a), (3)(a).

81. The Act's directive to the Department of Environmental Conservation to issue cost recovery demands is mandatory; the Department of Environmental Conservation has no discretion as to whether to issue payment demands under the Act. *See* § 76-0103(3)(e)(i) ("The department *shall* issue notices of cost recovery demand to all responsible parties at the time set forth in paragraph a of subdivision four of this section." (emphasis added)).

82. The Act charges all responsible parties with a $75 billion total liability, *see* § 76-0101(6) (defining "[c]ost recovery amount" as "seventy-five billion dollars"), and then provides a method to calculate each responsible party's share of the total $75 billion liability, § 76-0103(3)(b).

83. Each responsible party's "cost recovery demand shall be equal to an amount that bears the same ratio to the cost recovery amount as the responsible party's applicable share of

---

[12] The Act defines "cost recovery demand" as "the portion of the cost recovery amount determined by the [Department of Environmental Conservation] pursuant to the program to be owed by a responsible party for payment to the fund." § 76-0101(7). The Act defines "[n]otice of cost recovery demand" as "the written communication informing an entity that they are a responsible party and of the amount of the cost recovery demand payable to the fund." § 76-0101(17).

covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions of all responsible parties." § 76-0103(3)(b). Under this calculation, "[t]he applicable share of covered greenhouse gas emissions taken into account under this section for any responsible party shall be the amount by which the covered greenhouse gas emissions attributable to such responsible party exceeds one billion metric tons." § 76-0103(3)(c). "Such payments in aggregate shall total the cost recovery amount [$75 billion] and shall be due and payable on the applicable payment date." § 76-0103(2)(a).

84.    In other words, the Act's calculation of responsible parties' cost recovery demands is *not* limited to greenhouse gases emitted in New York. Rather, the Act makes clear that it holds energy producers strictly liable for *global* greenhouse gas emissions, and the Act's penalties are calculated with respect to those global emissions, not emissions originating in New York. § 76-0101(8) ("[C]overed greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining worldwide by such entity and are not limited to such emissions within the state."). Indeed, the volume of greenhouse gas emission originating in New York would be a tiny fraction of the total global volume.

85.    The Act further equates fossil fuel extraction and refining activities into a global greenhouse gas emissions volume based on presumptive equivalencies. *Id.* The Act assumes, without reason, that an entity's extraction and refining activities somehow equate to or can be connected to global greenhouse gas emissions, *see id.*; § 76-0103(3)(d), even though the majority of greenhouse gas emissions from fossil fuels are the result of third-party end use of fossil fuel products.

86.    The Act provides that "entities in a controlled group are treated as a single entity for the purposes of meeting the definition of responsible party and shall be jointly and severally liable for payment of any cost recovery demand owed by any entity in the controlled group." § 76-

0101(11). The Act defines an "[e]ntity" as "any individual, trustee, agent, partnership, association, corporation, company, municipality, political subdivision, or other legal organization that holds or held an ownership interest in a fossil fuel business during the covered period." *Id.* It defines "[c]ontrolled group" as "two or more entities that are affiliates of each other," § 76-0101(5), and it defines "[a]ffiliate" as "with respect to any specified entity, an entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the entity specified." § 76-0101(1).[13]

87.     By including liability for "controlled group[s]" within the definition of responsible parties, the Act disregards principles of corporate separateness and attempts to hold energy producers liable for global emissions purportedly attributable to not only those producers, but also their affiliated entities—irrespective of whether the State has jurisdiction over any such affiliated entities within the group.

88.     The Act gives authority to the Department of Environmental Conservation, "[i]n determining the amount of greenhouse gas emissions attributable to an entity," to require, among other things, "an entity to provide information to the department related to past practices, production, extraction, refining, emissions, or other historical information about such entity necessary or appropriate to enable the department to determine whether such entity is a responsible party and, if so, the amount of such responsible party's covered greenhouse gas emissions." § 76-0103(3)(d); *see also* § 76-0103(4)(a)(i) (giving Department of Environmental Conservation authority to promulgate regulations to carry out this information-gathering provision). The Act also instructs the Department of Environmental Conservation to "develop procedures to make publicly available, by

---

[13] The Act defines "[c]ontrol" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise." § 76-0101(4).

posting on its website, all data related to fossil fuel extraction and refining by entities which the department obtains pursuant to the program, to the maximum extent practicable." § 76-0103(5).

89.     The Department of Environmental Conservation must issue notices of cost recovery demand by June 30, 2029, § 76-0103(4)(a)(iv), and responsible parties must pay the cost recovery demand by December 31, 2029, § 76-0101(2) (defining "[a]pplicable payment date"). The cost recovery demand payment must be "made in full" on that date, or the department "*may*" allow responsible parties to pay 8% of the amount on the applicable payment date and "elect to pay" the remaining 92% of the amount within "twenty-four years of the applicable payment date." § 76-0103(3)(e)(i) (emphasis added). The Act provides that "[a]ny responsible party who fails to make a payment required . . . shall pay a penalty of fifty per centum of the unpaid payment amount, plus interest on the unpaid payment amount . . . from the date the payment was required to be paid." § 76-0103(3)(e)(ii).

90.     In other words, the clock has started, and covered energy producers will be required to pay their allocated share of the total $75 billion penalty, § 76-0103(2)(a) ("Such payments in aggregate shall total the cost recovery amount and shall be due and payable on the applicable payment date."), which necessitates equitable relief well before that deadline.

91.     For example, according to the memorandum circulated by the Act's sponsors, over the course of 25 years,[14] "Exxon Mobil" would owe $222 million per year (more than $5.5 billion total), "Shell" would owe $198 million per year (more than $4.9 billion total), "BP" would owe $183 million per year (more than $4.5 billion total), "Chevron" would owe $158 million per year (more than $3.9 billion total), "Peabody" would owe $156 million per year (more than $3.9 billion

---

[14] The memorandum was based on the Act as written before the chapter amendments were enacted, and the original version Act contemplated payments of $3 billion per year for 25 years (totaling $75 billion). *See* S.2129B § 6(c).

total), "Arch Coal" would owe $64 million per year (more than $1.6 billion total), CONSOL Energy would owe $25 million per year ($625 million total), and "Alliance Res P" would owe $7 million per year ($175 million total). Covered Companies Memorandum at 2; *see supra* ¶ 19.[15]

92.    And nothing in the Act restricts the Legislature from amending the Act to demand additional payments for time periods other than that specified in the Act. The New York Legislature has already done it—extending the outer limit of the coverage period of the Act from December 31, 2020, to December 31, 2025. Likewise, nothing in the Act restricts the Legislature from increasing at some future date the payments required for the January 1, 2000, to December 31, 2024 coverage period either.

93.    **The Act Uses Penalties Paid by Out-of-State Energy Producers to Subsidize New York's Climate Projects.** The Act provides that the Department of Environmental Conservation shall "accept and collect payment from responsible parties," deposit the payments from responsible parties in a climate change adaption fund, and "disperse funds to climate change adaptive infrastructure projects." § 76-0103(1), (2)(d), (2)(f).

94.    The "climate change adaptation cost recovery program" created by the Act is "administered by the" Department of Environmental Conservation to fund the State's preferred "climate change adaptive infrastructure projects within the state." *Id.* The proceeds from the penalties that covered producers pay are kept separate from other State funds. The Act provides that the cost recovery demand penalties "in the fund shall be kept separate and shall not be commingled with any other moneys in the custody of the comptroller or the commissioner of taxation and finance." N.Y. Finance Law § 97-m(3).

---

[15] Plaintiffs' members maintain that they should not be subject to liability under the Act, let alone these purported calculations of liability included in the memorandum.

95.     The "climate change adaptive infrastructure project[s]" funded by penalties paid by covered producers include a wide range of potential State-preferred projects, "includ[ing] *but . . . not limited to* projects designed to avoid, moderate, repair, or adapt to negative impacts caused by climate change, and to assist communities, households, and businesses in preparing for future climate change-driven disruptions." § 76-0101(3) (emphasis added).

96.     In other words, the Act's broad language allows New York to use the Act as a way to improve its failing and neglected infrastructure, *see* Report Card for New York Infrastructure, Am. Soc'y of Civ. Eng'rs (2022), https://perma.cc/Q464-GHYP (giving New York infrastructure an overall grade of C), while footing covered energy producers with the bill. That means that, as a practical matter, New York intends to have almost entirely out-of-state residents, both businesses and consumers, subsidize capital (and other) projects intended to benefit only the residents of New York.

## CLAIMS

### COUNT I
### FEDERAL PRECLUSION UNDER U.S. CONSTITUTION
### 42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION

97.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

98.     The Supremacy Clause in Article VI of the Constitution of the United States declares, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI.

99.     Under the U.S. Constitution, and Supreme Court and Second Circuit precedent, federal law must govern a State's attempt to impose liability for global greenhouse gas emissions that cross state lines and national borders because such interstate and international issues present uniquely federal interests and implicate competing interests and equal sovereignty of other States.

100.    The Second Circuit made that clear in *City of New York*, holding that "a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution," and, therefore, that any attempt "to hold" energy producers "liable, under New York law, for the effects of emissions made around the globe" is "simply beyond the limits of state law." 993 F.3d at 91-92.

101.    Applying that controlling precedent here, New York's Act is precluded by federal law and the federal Constitution.

102.    **Federal Law Governs Liability For Harms Arising From Interstate Greenhouse Gas Emissions.** Courts have historically held that state law is not competent to govern interstate disputes that present "uniquely federal interests." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (citation omitted); *AEP*, 564 U.S. at 421 (acknowledging that federal law "addresses subjects within national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands" (internal quotation marks and citation omitted)); *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 742 F.3d 37, 41 (2d Cir. 2014) (stating that federal law governs when "the relevant federal interest warrants displacement of state law" (internal quotation marks and citation omitted)). That is why courts have applied federal law as the rule of decision in cases ranging from interstate water disputes, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938); *City of Evansville v. Ky. Liquid Recycling, Inc.*, 604 F.2d 1008, 1018 (7th Cir. 1979), to interstate air carrier liability, *Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 384 (7th Cir. 2007). "In these instances," the structure of the U.S. Constitution and "our federal system do[] not permit the controversy to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641.

103.    Therefore, federal law controls liability for harms arising from interstate greenhouse gas emissions because such liability implicates "uniquely federal interests." *Rodriguez v. FDIC*, 589 U.S. 132, 136 (2020) (citation omitted). As the Second Circuit has already acknowledged, "For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91; *Milwaukee I*, 406 U.S. at 103 ("When we deal with air and water in their ambient or interstate aspects," federal law controls); *Ouellette*, 479 U.S. at 492 ("[T]he control of interstate pollution is primarily a matter of federal law."); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) (federal law governs "the general subject of environmental law and specifically includes ambient or interstate air and water pollution."). Such "controvers[ies]" involving interstate greenhouse gas emissions cannot "be resolved under state law." *Tex. Indus.*, 451 U.S. at 641.

104.    Federal law applies to such disputes because they "often implicate two federal interests that are incompatible with the application of state law: (i) the 'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *City of New York*, 993 F.3d at 91-92 (citation omitted) (alteration in original). In other words, federal law must apply to such disputes to avoid the conflicts that would occur if each of the 50 States were permitted to impose their disparate laws on the same interstate (and international) greenhouse gas emissions in their own preferred way. Such a global issue as greenhouse gas emissions, which "implicat[es] the conflicting rights of [s]tates [and] our relations with foreign nations," is "simply beyond the limits of state law." *Id.* at 92 (alteration in original) (quoting *Tex. Indus.*, 451 U.S. at 641).[16]

---

[16] As explained in detail by the Second Circuit in *City of New York*, it is the unique federal interest in governing interstate pollution under the U.S. Constitution that provided the justification

105.    **Constitutional Protections of State Sovereignty Limit States' Ability to Impose Their Laws on Out-of-State Greenhouse Gas Emissions.** Federal law also forecloses state attempts to impose liability for harms arising from interstate greenhouse gas emissions, given constitutional principles of state sovereignty. The inherent structure of the Constitution of the United States recognizes the equal sovereignty afforded to all States. *See Shelby County*, 570 U.S. at 544 ("Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among the States." (emphasis in original) (citation omitted)). This principle of equal sovereignty for each State in the Union is "obvious[]" and the "necessary result of the Constitution" and its establishment of the United States' federal system. *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914). "The sovereignty of each State, in turn, implie[s] a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

106.    The principle of equal sovereignty limits the ability of a State to "impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Gore*, 517 U.S. at 572.

107.    Although States have the sovereign authority to legislate within their own borders, there are constitutional limits on their ability to reach beyond their borders and tread on the

---

for recognition of federal common law over this area. 993 F.3d at 91-92. Just as those constitutional structural principles provided justification for recognition of federal common law causes of action in areas such as interstate and international pollution where state law is not competent to govern, those same principles continue to dictate that state law is not competent to govern such areas once Congress has chosen to displace federal common law by replacing it with a federal statute. *See id.* at 91-95. This is not to say that a state cannot apply its own law to greenhouse gases emitted from within its own borders, *see infra* ¶¶ 148-49 & note 17, but that is not what New York's Act does— it imposes liability for greenhouse gases emitted from all fifty States and around the globe. State law is not competent to govern such an interstate and international issue.

sovereignty of other States. *See Bonaparte*, 104 U.S. at 594 ("No State can legislate except with reference to its own jurisdiction. . . . Each state is independent of all the others in this particular."); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part and concurring in the judgment) (The Supreme Court has "long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests.").

108.    Indeed, the Supreme Court has recently counseled that a State may not "directly regulate[] out-of-state transactions by those with no connection to the State." *Nat'l Pork Producers Council*, 598 U.S. at 376 n.1 (emphasis omitted); *see also Gore*, 517 U.S. at 571.

109.    This limitation on States' abilities to extend their laws beyond their borders is an "'obviou[s]' and 'necessary result' of our constitutional order," even if it is "not confined to any one clause or section" of the Constitution. *Mallory*, 600 U.S. at 154 (Alito, J., concurring in part and concurring in the judgment) (quoting *N.Y. Life Ins. Co.*, 234 U.S. at 161); *see id.* at 154 n.2 (collecting cases). Rather, principles of extraterritoriality are "expressed in the very nature of the federal system that the Constitution created and in numerous provisions that bear on States' inter-actions with one another." *Id.* at 154.

110.    These principles are expressed in "not only the Commerce Clause, but also poten-tially several other constitutional provisions, including the Import-Export Clause, the Privileges and Immunities Clause, . . . the Full Faith and Credit Clause," and the Due Process Clause. *Nat'l Pork Producers Council*, 598 U.S. at 408 (Kavanaugh, J., concurring in part and dissenting in part); *N.Y. Life Ins. Co.*, 234 U.S. at 161 ("The principle however lies at the foundation of the full faith and credit clause and the many rulings which have given effect to that clause.").

111.    **The Due Process Clause of the Fourteenth Amendment Limits the Extraterri-torial Reach of State Laws.** States violate the Due Process Clause when they impose liability on out-of-state actors for conduct beyond their borders. An important aspect of due process of law is that a sovereign cannot legislate "except with reference to its own jurisdiction," *Bonaparte*, 104 U.S. at 594, which is "co-extensive with its territory," *Bevans*, 16 U.S. (3 Wheat.) at 387; *see Gore*, 517 U.S. at 571; *see also Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954) (acknowl-edging "the due process principle that a state is without power to exercise 'extra territorial juris-diction,' that is, to regulate and control activit[i]es wholly beyond its boundaries").

112.    The Due Process Clause is a principal source of protection against extraterritorial extensions of state law. U.S. Const. amend. XIV. The Supreme Court has recently suggested that constitutional principles, including "the Constitution's structure" and "the Due Process Clause," constrain state authority to legislate and enforce law extraterritorially. *Nat'l Pork Producers Coun-cil*, 598 U.S. at 376; *see also Mallory*, 600 U.S. at 156 (Alito, J., concurring) (explaining that the Supreme Court's decisions on due process and personal jurisdiction "reflect" a broader principle of "'territorial limitations' on state power") (citations omitted). Other courts too have explained that the Due Process Clause "limits a State's power to extend its law outside its borders"—and in fact is the "most powerful" of the "[t]erritorial limits on lawmaking." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 380 (6th Cir. 2013) (Sutton, J., concurring). Indeed, the Supreme Court has made clear that States cannot wield tort law to "punish a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003); *see Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981) (plurality); *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 818, 821-22 (1985); *see also McCluney v. Jos. Schlitz Brewing Co.*, 649 F.2d

578, 581 (8th Cir. 1981); *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 435-36 (4th Cir. 1999).

113.    **The Foreign Affairs Doctrine Limits States' Abilities to Interfere with the Federal Government's Foreign Affairs.** State law is also incompetent to govern liability based on international greenhouse gas emissions, which implicate the federal government's exclusive power over foreign affairs. The foreign affairs doctrine provides that under the U.S. Constitution, "[o]ur system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Zschernig*, 389 U.S. at 442-43 (Stewart, J., concurring) (citation omitted). Under the doctrine, states may not intrude "into the field of foreign affairs which the Constitution entrusts to the President and the Congress," and therefore, state laws are precluded to the extent they have "more than 'some incidental or indirect effect in foreign countries.'" *Id.* at 432, 434.

114.    Thus, under this doctrine, "[t]he exercise of the federal executive authority means that state law must give way where . . . there is evidence of clear conflict between the policies adopted by the two." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003); *see also In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 117-18 (2d Cir. 2010). Likewise, "when a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power, the Supremacy Clause prevents the state statute from taking effect." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc) (citing *Garamendi*, 539 U.S. at 426).

115.    **Federal Constitutional Law Precludes New York's Act.** For all these reasons, the U.S. Constitution structurally precludes the Act's imposition of penalties on energy producers for their purported shares of global greenhouse gas emissions. The U.S. Constitution does not permit

a single State like New York to dictate energy policy for the remainder of the Union through that State's imposition of liability for harms allegedly arising from global greenhouse gas emissions. Controlling Supreme Court and Second Circuit precedent, which recognizes the necessity of the application of federal law to the uniquely federal interests of interstate and international pollution in order to protect the equal sovereignty of States, and due process limits on States' ability to legislate beyond their borders in the U.S. federal system render the Act invalid under federal law.

116.    To start, the "interstate or international nature of" global greenhouse gas emissions "makes it inappropriate for" New York's Act "to control" that issue. *Tex. Indus.*, 451 U.S. at 640-41 & n.13. The Second Circuit's holding in *City of New York* makes this clear.

117.    Regardless of whether the Act's penalties are referred to as "cost recovery demands," fines, or fees, the purpose of the Act is straightforward: it is a state effort to impose liability for "global greenhouse gas emissions," *City of New York*, 993 F.3d at 91, by declaring energy producers "strictly liable," § 76-0103(3)(a), for those emissions. In other words, "[i]t is precisely because fossil fuels emit greenhouse gases," which "collectively" impact the climate, that New York is seeking penalties against energy producers. *City of New York*, 993 F.3d at 91 (emphasis omitted); *see* § 76-0101(8). The Second Circuit and other courts have held that States cannot impose liability for such actions under the U.S. Constitution's federal structure. *City of New York*, 993 F.3d at 91; *City of Annapolis v. BP PLC*, No. C-02-CV-21-000565, at 11 (Md. Cir. Ct. Jan. 23, 2025) (dismissing plaintiff's state tort claims against energy producers related to global greenhouse gas emissions because "the U.S. Constitution's federal structure does not allow the application of State Court claims like those presented in the instant cases"); *Platkin v. Exxon Mobil Corp.*, No. MER-L-001797-22, at 10 (N.J. Super. Ct. Feb. 5, 2025) ("[O]nly federal law can govern Plaintiffs'

interstate and international emissions claims because 'the basic scheme of the Constitution so demands.'" (quoting *AEP*, 564 U.S. at 421)).

118.     Just as a "nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may [not] proceed under [state] law," a State may not attempt to recover such damages for alleged harms arising from global greenhouse gas emissions through statutory penalties. *City of New York*, 993 F.3d at 91. New York's Act "does not seek to hold the Producers liable for the effects of emissions released in New York, or even in New York's neighboring states." *Id.* at 92. Rather, New York "intends to hold the Producers liable, under New York law, for the effects of emissions made around the globe over the past" three decades. *Id.* "In other words," the Act seeks to impose statutory penalties "for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet." *Id.*

119.     The expansive international reach of New York's Act is especially problematic. For example, under the Act, oil could be extracted in Asia, refined in Europe, and combusted as gasoline in South America—without ever coming close to the United States. Yet New York will attempt to penalize both the extractor and the refiner for any and all of the emissions purportedly associated with that oil upon its conclusion that the extractor and refiner are "responsible parties" under the Act's extremely broad definition of that term (including "controlled groups"). Even more troubling, New York will attempt to penalize those energy producers for any and all global emissions by any source—regardless of those emissions' connection to New York.

120.     Allowing a single State like New York to enact a law that interferes with the federal government's response to a global policy challenge like greenhouse gas emissions "sow[s] confusion and needlessly complicate[s] the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *Id.* at 103. Here, the Act intrudes upon the federal

government's foreign affairs power by "bypass[ing] the various diplomatic channels that the United States uses to address this issue, such as the U.N. Framework and the Paris Agreement." *Id.*

121.    For example, the Paris Agreement is an international agreement that resulted from collaboration between the United States and other countries around the world and one that the United States joined with the support of many energy producers. *See, e.g.*, Lamar Johnson, ExxonMobil Urges Trump Not to Withdraw from Paris Agreement Again, ESG Dive (Nov. 13, 2024), https://perma.cc/JLH8-5UGL; Samantha Raphelson, Energy Companies Urge Trump to Remain in Paris Climate Agreement, NPR (May 18, 2017), https://perma.cc/YU37-SP3J. This year, President Trump issued an order directing the United States Ambassador to the United Nations to "immediately submit formal written notification of the United States' withdrawal from the Paris Agreement." Exec. Order No. 14,162, 90 Fed. Reg. 8455 (Jan. 20, 2025). Although different Presidents have held different views about whether to remain a party to the Paris Agreement, those presidential decisions highlight the foreign-affairs issues implicated in the federal government's approach to addressing global climate change.

122.    As another example, the federal government has taken specific positions before the International Court of Justice on the issue of greenhouse gas emissions and attribution. As noted above, the United States asserted that "[b]ecause [greenhouse gases] from every particular source mix in the atmosphere with emissions from innumerable other sources, global effects cannot be linked to the location of any particular source of emissions." Int'l Court of Justice, Request by the United Nations General Assembly for an Advisory Opinion, Written Statement of the U.S., at 20, 67 (Mar. 22, 2024). This statement is in direct conflict with the purpose of New York's Act—

pinning the blame for greenhouse gas emissions and purported climate impacts on the State on a select handful of energy producers.

123.    Likewise, President Trump recently issued an executive order declaring a national energy emergency. Exec. Order No. 14,156. That order explained that "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation," and emphasized the international threats to U.S. energy security, the need to expand U.S. energy infrastructure, and the importance of international trade of unrealized energy resources. *Id.* The order concluded that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Id.* The New York Act exacerbates the international energy threats that form the basis of the executive order by burdening energy producers with $75 billion in penalties at a time when the President has determined that greater energy production from those producers is critical to the national security and foreign policy interests of the United States.

124.    Finally, as the Second Circuit has noted, "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level." *City of New York*, 993 F.3d at 103 n.11 ("[The United States] obviously [does] have [a] problem with the idea, and [doesn't] accept the idea, of compensation and liability and never accepted that and we're not about to accept it now." (quoting Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://perma.cc/4D56-JSRP)); *see also* Oliver Slow, US Refuses Climate Reparations for Developing Nations, BBC (July 13, 2023), https://perma.cc/ZW53-8ZYY; Nathan Layne, Trump Says He Would Renege on $3 Billion US Pledge for Green Climate Fund, Reuters (Dec. 14, 2023), https://perma.cc/FC9T-BEJG

(suggesting Trump Administration will continue this policy and has already signaled that it may pull other climate-related funding). Yet New York's Act attempts to do exactly that—establish a punitive liability and compensation scheme based on the (speculatively calculated) impact to New York from global greenhouse gas emissions, contrary to the policy goals of the federal government as reflected in international climate negotiations.

125.    Therefore, the Act presents a "clear conflict" with an "express federal policy," which is "alone enough to require state law to yield" to federal law. *Garamendi*, 539 U.S. at 425. In holding that New York City could not impose its law on international greenhouse gas emissions through a nuisance action, the Second Circuit explained that "condoning an extraterritorial nuisance action here would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern" under the Clean Air Act. *City of New York*, 993 F.3d at 103. The same concerns apply here—allowing New York to attempt to impose liability based on foreign emissions could upset foreign policy goals, interfere with international climate change discussions, and upset trade with foreign countries. "Because it therefore 'implicat[es] the conflicting rights of [s]tates [and] our relations with foreign nations,'" the Act and its penalties for global greenhouse gas emissions "pose[] the quintessential example of when" federal law "is most needed." *Id.* at 92 (quoting *Tex. Indus.*, 451 U.S. at 641).

126.    A single State like New York cannot dictate greenhouse gas emissions liability rules for the entire United States or other countries across the world. But that is the purpose and effect of the Act—to attempt to "regulate," via significant penalties, energy producers' "behavior far beyond New York's borders." *Id*. Although the Act imposes a retroactive penalty for past emissions, the Act—much like the tort liability for past actions at issue in *City of New York*—has no limiting

principle. If the Act is permitted to stand, then New York (or other States) could hold current and future energy producers strictly liable and penalize them for hundreds of millions or billions of dollars going forward. And if energy producers attempt to "mitigate" such future liability, whatever actions they would take "must undoubtedly take effect across every state (and country)." *Id.* Because the Act's penalties are tied to responsible parties' "shares" of global greenhouse gas emissions, § 76-0103(3)(b), a covered energy producer could only avoid or limit liability for future conduct from similar legislative penalties by ceasing operations globally. In this way, New York is single-handedly dictating nationwide and global emissions policy, contrary to the principles and structure of the United States Constitution and federal system.

127.    Therefore, New York's "sprawling" scheme that targets greenhouse gas emissions emitted in all 50 States and in countries around the globe "is simply beyond the limits of state law." *City of New York*, 993 F.3d at 92.

128.    It does not matter that the Act imposes a penalty as opposed to "a standard of care or emission restrictions." *Id.* at 93. That is because its "cost recovery demand" scheme is "even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released." *Id.* Thus, even if the Act tries to "regulate cross-border emissions in an indirect and roundabout manner, it . . . regulate[s] them nonetheless." *Id.*

129.    At bottom, New York's imposition of penalties against energy producers would "upset[] the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *Id.*; *see also AEP*, 564 U.S. at 427.

130.    The Act also invades the equal sovereignty of other States and thus transgresses the structural constitutional and due process limits on States' abilities to extend their laws beyond their borders by unconstitutionally imposing liability and penalties on energy companies outside of New York for global greenhouse gas emissions produced by lawful activities outside of New York's borders.

131.    The greenhouse gas emissions for which New York seeks to penalize energy producers have no direct connection to New York and indeed have no more connection to New York than to any other State in the United States or to any other country in the world. New York is up front about this—the Act states that it applies to "worldwide" emissions and such emissions "are not limited to [those] within the state." § 76-0101(8). Indeed, a memorandum circulated by the Act's sponsors listing companies that would be covered by the Act designates half of the companies it lists (19 of 38) as outside the United States. *See* Covered Companies Memorandum at 1-2. Thus, New York is attempting to "directly regulate[] transactions which take place . . . wholly outside the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982) (plurality op.). In doing so, New York is imposing liability on wholly *extraterritorial* activity and impermissibly "project[ing]" its "regulatory regime into the jurisdiction" of other States. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 337 (1989); *see Gore*, 517 U.S. at 571-72 ("[A] State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.").

132.    The Act by its own terms imposes liability that is triggered predominantly by activities taking place beyond its borders. New York produces a "small amount of crude oil" and has some production of natural gas, but it has no coal mines or oil refineries. *See* New York State Profile, https://perma.cc/5TWE-APRG; *supra* ¶ 50. Thus, the Act's threshold of "one billion tons of covered greenhouse gas emissions" can be triggered only by conduct outside of New York. § 76-

0101(21). In other words, under the Act's definition of "responsible party," no company listed in the memorandum circulated by the Act's sponsors, *see supra* ¶ 19, or any company in existence, could meet the one-billion-ton threshold for the 25-year period based solely upon emissions from within New York. Therefore, the Act imposes liability based on out-of-state activity because, even if greenhouse gas emissions released through consumption in New York from 2000 to 2024 could be attributed to an energy producer, that producer would be a "responsible party" liable under the Act only because of its extraterritorial conduct.

133.    Other States and their citizens are directly affected by New York's Act. By penalizing energy producers with massive fines, New York is essentially dictating greenhouse gas emission liability rules and energy policy for the other 49 States. Its Act will likely negatively affect energy production and could increase energy costs that could be borne by citizens of all States, not just New York. Although New York would reap the benefits of millions of dollars to fund its preferred climate change adaptation projects, citizens of other States would receive no benefits, only costs.

134.    Moreover, New York's Act attempts to impose liability upon refining and extracting operations that have no presence within its borders but are a critical industry for other States. As explained above, no energy producers conduct coal mining or refining activities in New York, and only small amounts of oil and gas are produced in the State. *See supra* ¶¶ 36, 50. But States like Texas, Louisiana, Oklahoma, North Dakota, West Virginia, and Pennsylvania are home to large energy producers who not only provide energy for their respective citizens (in addition to citizens of other states and countries) but also support those States' economies with jobs, revenue, and other benefits through significant extraction and refining operations. *See supra* ¶¶ 29-32, 52-58. Those benefits enjoyed by other sovereigns like Texas, Louisiana, Oklahoma, North Dakota, West

Virginia, and Pennsylvania will be negatively affected by New York's Act, despite the fact that New York lacks any such relationship with the energy production industry.

135.    The Solicitor General of the United States recently acknowledged the limits on States' abilities to regulate greenhouse gas emissions outside their borders. In the United States' amicus brief in *Sunoco LP v. City & County of Honolulu*, the Solicitor General noted that the energy-producer defendants in that case had raised arguments that the plaintiffs' tort claims involving greenhouse gas emissions "are barred by the Interstate and Foreign Commerce Clauses, the Due Process Clause, and federal primacy in foreign affairs," and acknowledged that "[t]hose constitutional arguments may ultimately be held to foreclose [plaintiffs'] state-law claims to the extent they are based *on emissions or other conduct outside Hawaii*." Brief for the United States as Amicus Curiae at 6-7, *Sunoco LP v. City & County of Honolulu*, Nos. 23-947 (U.S. Dec. 10, 2024) (emphasis added); *see id.* at 12 (recognizing that defendants "may ultimately prevail on their contention that respondents' claims are barred by the Constitution . . . to the extent the claims rely on conduct occurring outside Hawaii"); *id.* at 13-14 (noting that "courts could conclude that the Constitution bars the state-law claims to the extent they rely on conduct occurring outside Hawaii").

136.    These recent statements by the Solicitor General accord with the federal government's consistent position on this issue. The government has told the U.S. Supreme Court that state-law claims seeking redress for interstate and international greenhouse gas emissions were "inherently federal in nature." Oral Arg. Tr. at 31, *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (2021). It also argued to the Ninth Circuit that such claims were "irreconcilable with the constitutional commitment of such matters to the national government and the relative rights and obligations of the national government and States under the structure of the Constitution."

U.S. Rehearing Br. at 12, *City of Oakland v. B.P. PLC*, 969 F.3d 895 (9th Cir. 2020) (No. 18-16663).

137.    In short, New York "has attempted, in essence, to unilaterally impose its moral and policy preferences for" energy production "on the rest of the Nation," demanding money from energy producers to fund its own preferred climate projects while the rest of the Nation foots the bill. *Nat'l Pork Producers Council*, 598 U.S. at 406 (Kavanaugh, J., concurring in part and dissenting in part). "[New York's] approach undermines federalism and the authority of individual States by forcing individuals and businesses in one State" to bear costs and changes to energy products due to the "law[] of a *different* State." *Id.* at 407.

\*    \*    \*

138.    The Act unconstitutionally extends state law into an area that is governed exclusively by federal law and invades the equal sovereignty of the other States in the Union through its unconstitutionally extraterritorial reach. Therefore, under the structure of the U.S. Constitution and controlling precedent, the Act is precluded by federal law, and it may not be enforced against the Chamber's, API's, NMA's, and BCNYS's covered members.

139.    If the Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's, API's, NMA's, and BCNYS's covered members.

### COUNT II
### FEDERAL PREEMPTION UNDER THE CLEAN AIR ACT
### 42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION

140.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

141.    "[T]he Supremacy Clause 'invalidates state laws that "interfere with, or are contrary to," federal law.'" *Clean Air Mkts. Grp.*, 338 F.3d at 86-87 (citations omitted).

142.    The federal Clean Air Act preempts New York's Act because the imposition of penalties for global greenhouse gas emissions falls outside the "slim reservoir" of remaining state

authority to independently regulate greenhouse gas emissions outside the parameters of the Clean Air Act. *City of New York*, 993 F.3d at 100.

143.    In *Massachusetts v. EPA*, the Supreme Court held that greenhouse gas emissions are "pollutants" covered by the Clean Air Act and thus subject to regulation by the EPA. 549 U.S. at 528-29. Therefore, under the Clean Air Act, EPA decides on "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector" through an "informed assessment of competing interests." *AEP*, 564 U.S. at 427. "Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *Id.* In the first instance, "[t]he Clean Air Act entrusts such complex balancing to EPA." *Id.*

144.    Pursuant to its authority under the Clean Air Act, for example, EPA has promulgated New Source Performance Standards that address greenhouse gas emissions from fossil fuel operations, among other sources. *See* 40 C.F.R. §§ 60.5360a-60.5439a. Moreover, EPA imposes mandatory greenhouse gas reporting requirements on various entities. *See* 40 C.F.R. §§ 98.1 *et seq.* And EPA imposes procedures for new or substantially modified facilities to use the best available control technology for greenhouse gas emissions. *See* 40 C.F.R. § 51.166(j). In addition, EPA has promulgated regulations to address greenhouse gas emissions from end users of fossil fuel products, including cars, trucks, planes, and power plants. *See, e.g.*, Carbon Pollution from Transportation, EPA (May 14, 2024), https://perma.cc/7ZD5-3VLY (discussing and linking to several EPA programs to reduce greenhouse gas emissions from transportation); Greenhouse Gas Standards and Guidelines for Fossil Fuel-Fired Power Plants, EPA (Feb. 13, 2025), https://perma.cc/3BXJ-ZHGE (discussing the EPA's new rules regarding pollution standards for power plants); Repeal of the Clean Power Plan, 84 Fed. Reg. 32520 (July 8, 2019) (finalizing Affordable Clean Energy rule

that consisted of emissions guidelines for greenhouse gas emissions from power plants). Pursuant to a specific mandate that Congress first imposed in 2005, EPA has also issued regulations to ensure that required volumes of renewable fuels are used in the transportation fuel supply in order to address greenhouse gas emissions in the transportation sector. *See, e.g.*, Overview of the Renewable Fuel Standard Program, EPA (May 16, 2024), https://perma.cc/J7FN-AJ5L (discussing the Renewable Fuel Standard program, "a national policy that requires a certain volume of renewable fuel be used to replace or reduce the quantity of fossil fuel in transportation fuel, home heating oil, or jet fuel").

145.    As explained above, by virtue of the overarching constitutional principle that state law is not competent to govern out-of-state or international emissions, federal law—initially federal common law—has always governed interstate disputes involving emissions of air pollutants. *See supra* ¶¶ 102-04. But the Supreme Court has held that the Clean Air Act displaces any claim grounded in federal common law involving interstate greenhouse gas emissions. *AEP*, 564 U.S. at 425-26. In other words, the Clean Air Act is now the federal standard governing any claims involving interstate greenhouse gas emissions. Thus, because the Clean Air Act "provides a means to seek limits on emissions," there is no other "room for a parallel track" of regulation. *Id.* at 425. Now that the Clean Air Act governs regulations of greenhouse gas emissions in the United States, States like New York may regulate out-of-state emissions only as permitted by the Clean Air Act. This is because "'resort[ing] to state law' on a question previously governed by federal common law is permissible only to the extent 'authorize[d]' by federal statute." *City of New York*, 993 F.3d at 99 (alterations in original) (quoting *Milwaukee III*, 731 F.2d at 411).

146.    Here, "the Clean Air Act does not authorize the type of state-law" penalties New York's Act "seeks to" impose on energy producers. *Id.*

147.    The Clean Air Act "anoints the EPA as the 'primary regulator of [domestic] green-house gas emissions.'" *Id.* (alteration in original) (quoting *AEP*, 564 U.S. at 428). Although the Clean Air Act includes savings clauses that allow "states to create and enforce their own emissions standards applicable to in-state polluters," *id.* at 99 (citing 42 U.S.C. §§ 7416, 7604(e)), that "authorization is narrowly circumscribed," *id.* at 100.

148.    In *International Paper Co. v. Ouellette*, the Supreme Court held that the Clean Water Act "pre-empts state law to the extent that the state law is applied to an out-of-state point source." 479 U.S. at 500. The Court explained that "the only state suits that remain available are those specifically preserved by the Act," and that "[a]n interpretation of the saving[s] clause that preserved actions brought under an affected State's law would disrupt th[e] balance of interests" established by Congress under the Clean Water Act. *Id.* at 492, 495. Specifically, an interpretation of the statute that would permit one state to apply its laws to regulate out-of-state emissions of pollutants would "upset[] the balance of public and private interests so carefully addressed by the Act." *Id.* at 494. "The application of affected-state laws would be incompatible with the Act's delegation of authority and its comprehensive regulation of water pollution." *Id.* at 500. The same statutory features are present in the Clean Air Act, and the same preemption analysis governs.

149.    Under the Clean Air Act, only a "slim reservoir" of state authority exists to independently regulate emissions outside the Clean Air Act's regulatory scheme. *City of New York*, 993 F.3d at 100.[17] Specifically, consistent with *Ouellette*, the Clean Air Act "has been interpreted to

---

[17] Although States play a critical role in implementing the Clean Air Act's regulation of air pollution, *see generally* Government Partnerships to Reduce Air Pollution, EPA (Aug. 6, 2024), https://perma.cc/4GF2-34PS (providing examples of how local, state, federal, and tribal governments are working together to reduce pollution), they have no authority to regulate emissions beyond their borders outside of that national regulatory scheme, *see City of New York*, 993 F.3d at 100.

permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id.* (alterations in original) (quoting *Ouellette*, 479 U.S. at 497); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 197 (3d Cir. 2013) ("[T]he Clean Air Act does not preempt state common law claims based on the law of the state where the source of the pollution is located."); *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) (noting that "claims based on the common law of the source State" are "not preempted by the Clean Air Act," whereas "claims based on the common law of a non-source State . . . are preempted by the Clean Air Act").

150.    State laws that seek to impose monetary consequences—whether through common-law tort damages or statutory monetary penalties—on "emissions emanating simultaneously from all 50 states and the nations of the world" do not fit within the "slim reservoir" of state authority under the Clean Air Act. *City of New York*, 993 F.3d at 100. To permit such state action "would 'undermine this carefully drawn statute through a general savings clause'" and would "serious[ly] interfere[ ] with the achievement of the full purposes and objectives of Congress." *Id.* (alterations in original) (quoting *Ouellette*, 479 U.S. at 493-94).

151.    Here, the Clean Air Act preempts New York's Act because the New York Act imposes liability on energy producers for *global* greenhouse gas emissions emitted *outside* of New York. § 76-0101(8) ("[C]overed greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining *worldwide* by such entity." (emphasis added)). It explicitly extends liability far beyond emissions released solely in New York. *Id.* ("[C]overed greenhouse gas emissions . . . are not limited to such emissions within the state."). Thus the Act, on its face, runs afoul of Supreme Court and Second Circuit precedent. *See Ouellette*, 479 U.S. at 497; *City of New York*, 993 F.3d at 100; *see also City of Annapolis*, No. C-02-CV-21-000565, at 11 ("[C]laims in this case seeking damages for injuries resulting from out-of-state or global greenhouse emissions

and interstate pollution, are pre-empted by the [Clean Air Act]." (quoting *State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888, at *9 (Del. Super. Ct. Jan. 9, 2024))).

152.    Indeed, the entire theory behind New York's Act is that once greenhouse gas emissions have been released into the atmosphere, those emissions collectively contribute to changes in the Earth's climate, and those changes to climate result in the purported harms to the State of New York. The Act concedes that it does not seek to impose liability for only those emissions released in New York. Even if it did, any such emissions would be minuscule compared to emissions from a host of different sources (predominantly end users) around the rest of the globe. Nevertheless, New York seeks to impose liability for all "worldwide" greenhouse gas emissions. § 76-0101(8). The Clean Air Act preempts its attempt to do so.

153.    Permitting States like New York to penalize energy producers for out-of-state emissions would "undermine [the] regulatory structure" provided by the Clean Air Act and would "lead to chaotic confrontation between sovereign states." *Ouellette*, 479 U.S. at 496-97 (citation omitted).

154.    Because the Clean Air Act preempts New York's Act, it may not be enforced against the Chamber's, API's, NMA's, and BCNYS's covered members.

155.    If New York's Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's, API's, NMA's, and BCNYS's covered members.

**COUNT III**
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**

156.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

157.    The Act's imposition of significant retroactive penalties based on an arbitrary and irrational method of attributing to specific energy producers the purported costs of climate change

to New York from over two decades of global greenhouse gas emissions (emitted primarily by other people and entities) violates the Due Process Clause of the Fourteenth Amendment. U.S. Const. amend. XIV.

158.  "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *see also E. Enters.*, 524 U.S. at 537 (plurality opinion) (holding that to succeed on due-process claim, moving party must "establish that its liability under the Act is 'arbitrary and irrational'" (quoting *Usery*, 428 U.S. at 15)). Moreover, due process protects individuals from overly "harsh and oppressive" "economic legislation." *Pension Benefit Guar. Corp.*, 467 U.S. at 733; *see also Canisius Coll.*, 799 F.2d at 25 ("[The] 'harsh and oppressive' test does not differ from the test of constitutionality applicable to economic legislation generally, namely, that such legislation is constitutional unless Congress has acted in an arbitrary and irrational way.").

159.  That protection includes prohibiting governments from "retroactive[ly]" imposing financial penalties that are arbitrary and irrational or "so harsh and oppressive as to transgress the constitutional limitation" of due process. *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regul. of Fla.*, 496 U.S. 18, 41 & n.23 (1990) (citation omitted); *E. Enters.*, 524 U.S. at 547 (Kennedy, J., concurring in the judgment and dissenting in part) ("[D]ue process requires an inquiry into whether in enacting the retroactive law the legislature acted in an arbitrary and irrational way."). The Supreme Court has recognized that "retroactive lawmaking is a particular concern for the courts because of the legislative 'tempt[ation] to use retroactive legislation as a means of retribution against unpopular groups or individuals.'" *E. Enters.*, 524 U.S. at 548 (Kennedy, J., concurring in the judgment and dissenting in part) (alteration in original) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994)); *Opati v. Republic of Sudan*, 590 U.S. 418, 425

(2020) ("The principle that legislation usually applies only prospectively . . . protects vital due process interests, ensuring that 'individuals . . . have an opportunity to know what the law is' before they act, and may rest assured after they act that their lawful conduct cannot be second-guessed later." (citation omitted)). Therefore, "[t]he retrospective aspects of [economic] legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *E. Enters.*, 524 U.S. at 547-48 (Kennedy, J., concurring in the judgment and dissenting in part) (alteration in original) (citation omitted).

160.    Here, the Act transgresses due process in several ways.

161.    *First*, it imposes a harsh and oppressive retroactive penalty on energy producers for global greenhouse gas emissions emitted over *25 years* from January 1, 2000, to December 31, 2024.[18] Nothing about that period of liability is "modest," "short," or "limited." *See, e.g.*, *id.* at 528. On the contrary, it imposes liability on energy companies for actions taken as long as *25 years ago*. *See id.* at 549-50 (Kennedy, J., concurring in the judgment and dissenting in part) (concluding that a law that "create[ed] liability for events which occurred 35 years ago" violated due process); *James Square Assocs. LP v. Mullen*, 993 N.E.2d 374, 383 (N.Y. 2013) (holding that state law with a 16-month retroactivity period was unconstitutional because the sole state purpose offered—"raising money for the state budget"—was "insufficient to warrant [such] retroactivity"). The lump-sum, multi-billion-dollar penalties that New York seeks to impose retroactively are qualitatively

---

[18] Although CERCLA also imposes retroactive, strict liability, it is different from New York's Act. CERCLA permits retroactive liability related to the costs of cleaning up specific pollutants at sites that meet specific criteria. That liability may be imposed only on potentially responsible parties who have specific connections to—such as one who "disposed" of hazardous waste at—a specific site at issue. The New York Act, on the other hand, penalizes only a handful of energy producers for three decades of greenhouse gas emissions resulting from the collective conduct of billions of people, and uses the proceeds from the penalties imposed to fund unknown future climate-related projects. *See supra* note 9.

different from anything that energy producers could have reasonably expected. Nothing energy producers can do today can affect their liability under the Act. New York's law punishes energy companies for lawful actions taken long ago—when they had no opportunity to know what the law would be before they acted—and subjects them to New York's second-guessing of their actions many years after the fact. *See Opati*, 590 U.S. at 425. Such a significant and far-reaching retroactive law is completely different from the types of laws the Supreme Court has previously upheld.

162.    *Second*, the Act imposes an arbitrary and irrational punishment on energy producers. To start, the Act's punishment is arbitrary because the coverage period defining producers' liability provides no reasonable basis for selecting the date range of January 1, 2000, to December 31, 2024, as opposed to a shorter period. The Act justifies this coverage period based on the claim that "[o]ver 70 percent of the total increase in greenhouse gas concentrations since the Industrial Revolution has occurred since 1950, with a marked increase in the rate of emissions after the year 2000." S.2129B § 2(7). That justification conveniently ignores New York's "long history of crude oil production" in the 19th and 20th centuries. New York State Profile, https://perma.cc/5TWE-APRG. That fact makes the Act's coverage period particularly arbitrary given that carbon dioxide emissions, for example, remain in the atmosphere for centuries. MIT Climate Portal Writing Team, How Do We Know How Long Carbon Dioxide Remains in the Atmosphere?, MIT Climate Portal (Jan. 17, 2023), https://perma.cc/3BPX-YJRF. Moreover, carbon dioxide molecules, "once they enter the air, follow different paths and can last for radically different amounts of time." *Id.*[19] The Act also claims that "[b]y 2000 the science of climate change was well established, and no reasonable corporate actor could have failed to anticipate regulatory action to address its impacts."

---

[19] For these same reasons, the Act's claim that "the data necessary to attribute proportional responsibility is very robust in the covered period," is also wrong and fails to reasonably justify the Act's covered period. S.2129B § 2(7).

S.2129B § 2(7). But at that time—as it is today—energy production was lawful, encouraged, and vital in the United States. *See supra* ¶¶ 29-35. And in no way were energy producers on reasonable notice in 2000 that individual States like New York would seek to impose strict-liability-based penalties on them decades later. Therefore, New York has no sound basis for choosing 25 years as its coverage period, and even within that coverage period, New York cannot fairly and accurately attribute specific impacts in New York to specific greenhouse gas emissions (out of all global greenhouse gas emissions).[20]

163.    The Act's selection of a $75 billion overall cost for the purported impact to the State from the emission of greenhouse gas emissions is also arbitrary. The Act's only justification for this chosen amount is the estimated cost to complete a handful of vaguely defined potential infrastructure projects. S.2129B § 2(6)(b). The Act does not explain how these examples of projects are tied to greenhouse gas emissions attributable to the responsible parties covered by the Act, much less emissions tied to in-state use or consumption. Nor does it justify why it chose $75 billion as opposed to a different, lower number, which is especially arbitrary given the many different emitters of greenhouse gas emissions and the fact that most greenhouse gas emissions from fossil fuels are emitted through combustion by end users, including the State of New York itself and its tens of millions of residents. *See supra* ¶¶ 35, 37-38, 41-45.

164.    Moreover, the legislative history of the Act shows that the Legislature arbitrarily chose the $75 billion number out of thin air. First, the Legislature initially contemplated a total penalty of $30 billion before more than doubling it to $75 billion. *See* N.Y. State Assemb., June 7, 2024 Chamber Debate, 2023-24 Legislative Session, at 308-09 (June 7, 2024),

---

[20] Likewise, New York provides no reasonable basis for extending the coverage period from January 1, 2000, to December 31, 2018, in the original law, *see* S.2129B, to January 1, 2000, to December 31, 2024 in the chapter amendments, *see* S.824.

https://perma.cc/UX7W-JSU7 (Assemblyman Simpson questioning the increase from $30 to $75 billion in penalties). Second, in explaining why the $75 billion number was chosen, Assemblyman Dinowitz stated, "We didn't want it to be too little, we didn't want it to be too much. We wanted it to be just right." *Id.* at 350-51. Thus, as Assemblyman Slater aptly put it, New York's selection of $75 billion was "just like Goldilocks," with "really no . . . scientific reason or economic reason [for] pick[ing] those numbers." *Id.* at 351.

165.    The Act's arbitrary selection of $75 billion as the total cost to the state that covered energy producers must pay runs afoul of the Fourteenth Amendment's protections against penalties without fair notice and the arbitrary deprivation of property. The "reason" for these protections is that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *State Farm*, 538 U.S. at 417 (citation omitted). Here, covered energy producers had no notice that New York would subject them to $75 billion in penalties for their legal business activities over the course of 25 years. And just like a "grossly excessive" punitive damages award, the Act's random selection of $75 billion in total penalties against covered energy producers "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.*

166.    The Act also arbitrarily targets a select handful of energy producers to pay the $75 billion total cost. The Act states that "the largest one hundred fossil fuel producing companies are responsible for more than 70% of global greenhouse gas emissions since 1988, and therefore bear a much higher share of responsibility for climate damage to New York State than is represented by . . . $75 billion." S.2129B § 2(6)(c). According to this statement alone, up to 30% of greenhouse gas emissions are still attributable to other energy producers or other non-energy producer entities.

In any event, the legislative history of the Act shows that New York intends it to cover about 38 energy companies, not 100. *See supra* ¶ 19. This means that the "more than 70%" figure relied upon to justify the Act and its $75 billion total cost necessarily overestimates the greenhouse gas emissions that could be attributed to the responsible parties subject to the Act.

167.    *Third*, the Act uses an irrational and arbitrary method to calculate energy producers' punishment for global greenhouse gases. The Act provides that responsible parties will be liable for cost recovery demands based on an amount "that bears the same ratio to the cost recovery amount as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions of all responsible parties." § 76-0103(3)(b). But calculating the purported impact of global greenhouse gas emissions on New York and attributing global greenhouse gas emissions that caused that impact to each responsible party is impossible. "Greenhouse gases once emitted 'become well mixed in the atmosphere,'" *AEP*, 564 U.S. at 422 (citation omitted)), and after that point, "[g]reenhouse gas molecules cannot be traced to their source," *City of New York*, 993 F.3d at 92 (internal record citation omitted). Thus, as the Supreme Court has recognized, "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422.

168.    Indeed, New York's attempt to pin blame on specific energy producers for the purported impacts to the State from climate change caused by global greenhouse gas emissions is vastly different from attributing pollution in a river to an upstream facility or leaching from a particular waste site. The theory behind New York's Act is that global greenhouse gas emissions collectively have caused changes to the climate, such as warming the atmosphere, and those changes have harmed New York. But there is no fair and accurate way to attribute to specific energy producers the purported impacts to New York caused by climate change due to 25 years of

global greenhouse gas emissions in the atmosphere resulting from the collective conduct of billions of people all around the world. Likewise, New York also cannot accurately and fairly determine what purported impacts and costs to the State were caused by greenhouse gas emissions during the 25-year coverage period versus those caused before that period or by environmental factors unrelated to greenhouse gas emissions. For these reasons, the Act cannot with any accuracy or fairness calculate the purported impact to New York from global greenhouse gas emissions, nor can it accurately or fairly attribute such impact from global greenhouse gas emissions to specific energy producers.

169.    The Act will also impose a punishment that unfairly and arbitrarily overestimates the targeted energy producers' purported contributions to climate change. Through its definition of "responsible part[ies]" and its calculation method, § 76-0101(21), the Act targets a handful of large energy producers and singles them out as the sole contributors to climate change by attributing all the purported impacts in New York to greenhouse gas emissions solely to fossil fuels (and solely to that handful of energy producers). But it ignores greenhouse gas emissions from many other sources across the globe, including fossil fuel activities conducted by the United States and foreign governments, nation-owned fossil fuel companies, wood-fuel burning,[21] forest fires and deforestation, methane from farm animals, agriculture, other land-use activities, transportation, and many others.

---

[21] Indeed, "in 2022, . . . wood-fueled power plants contributed almost three-tenths of [New York's] biomass-fueled generation." New York State Profile, U.S. Energy Info. Admin. (last updated Dec. 21, 2023), https://perma.cc/8BDC-F9X4. And according to one scholar, "some smokestack emission tests show burning wood results in carbon emissions 2.5 times higher than natural gas and 30 percent higher than coal." Jim Finley, Burning Wood? Caring for the Earth?, Penn State Coll. of Agric. Scis. (Feb. 15, 2021), https://perma.cc/6M9A-NRRM. Yet the Act omits any liability for New York's own contribution to greenhouse gas emissions in the atmosphere.

170.    For example, the World Economic Forum has stated that almost a quarter of "global greenhouse gas emissions in 2007-2016 came from agriculture and land-use change, approximately half of which is due to deforestation." To Tackle Deforestation We Need to Focus on Land Use. Here's Why., World Econ. F. (Sept. 13, 2022), https://perma.cc/8RJJ-N4X4.

171.    Yet, those responsible for such agricultural and land-use activities are not covered by New York's Act. Worse, covered energy producers will bear the punishment for the greenhouse gas emissions emitted by those non-fossil fuel sources. Although the Act defines "[c]overed greenhouse gas emissions" to mean the total "worldwide" emissions in the atmosphere, § 76-0101(8), New York cannot determine which greenhouse gas molecules were emitted by fuels extracted by energy producers or establish that those molecules (as opposed to emissions from other non-fossil fuel sources) caused specific climate change impacts on the State of New York.

172.    The Act also targets mainly energy producers operating in the United States even though many other companies and consumers across the globe have contributed to global greenhouse gas emissions. For one, energy producers from countries around the world extract and refine fossil fuels and then consumers across the globe use those fuels in a wide variety of ways in everyday life. *See* Report: China Emissions Exceed All Developed Nations Combined, BBC (May 6, 2021), https://perma.cc/2SN8-AWW2.

173.    Moreover, in the context of fossil fuels, it is the end users, not energy producers, who emit the vast majority of greenhouse gas emissions. *See supra* ¶ 38. Companies from a host of different industries beyond energy production emit greenhouse gases when they use fossil fuels to power their machines, equipment, and operations. Likewise, consumers emit greenhouse gases from the transportation and utilities they choose to use. Thus, there is no way to accurately or fairly pin liability on a handful of domestic energy producers for the purported impact of greenhouse gas

emissions released when fuel is extracted or refined versus those released by other companies and individuals across the globe, especially when it is other entities who emit the vast majority of greenhouse gases.

174.    The Act's calculation method also unfairly and arbitrarily allocates liability among energy producers. Specifically, the Act's calculation method could result in domestic energy producers paying disproportionate penalties as compared to international energy producers. The Act apportions liability based on a responsible party's "share of covered greenhouse gas emissions" compared to "the aggregate applicable shares of covered greenhouse gas emissions *of all responsible parties.*" § 76-0103(3)(b) (emphasis added). In other words, the numerator is the emissions attributed to a single responsible party, and the denominator is the total emissions attributed to all *responsible* parties. But because the term "responsible party" excludes "any person who lacks sufficient contacts with the state to satisfy the due process clause of the United States Constitution," § 76-0101(21), many energy producers—particularly foreign producers—will likely be able to show that they lack sufficient contacts with New York to satisfy due process and are not responsible parties under the Act. And two of the top four producers on New York's "Approximate List of Covered Companies," which, according to the list, account for almost 28% of emissions, are owned by foreign sovereigns that may be immune from liability under New York's Act. *See supra* ¶ 19. If foreign producers escape liability under the Act, the remaining, largely domestic, energy producers would pay a larger share of the $75 billion total cost than they would have if the denominator included *all* energy producers. Such an approach to calculating the Act's penalties is irrational, arbitrary, and unfair.

175.    The Act also arbitrarily and unlawfully imposes joint and several liability on entities in a "controlled group," requiring that such entities be "treated as a single entity" and be "jointly

and severally liable for payment of any cost recovery demand owed by any entity in the controlled group." § 76-0101(11). Lumping separate corporate entities together and making them jointly and severally liable for payment of the Act's severe penalties is arbitrary because it does not distinguish between worldwide emissions purportedly attributable to one entity over another, and in failing to do so, it disregards corporate separateness principles and protections—not to mention the jurisdictional limitations of the State. In fact, the Act's definitions of "[a]ffiliate," "[c]ontrol," "[c]ontrolled group," and "[e]ntity," appear intentionally designed to attempt to reach any and all companies affiliated with energy producers that can meet the definition of a "[r]esponsible party," regardless of corporate veils and international borders. § 76-0101(1), (4)-(5), (11), (21); *see supra* ¶ 86-87.

176.    *Fourth*, the Act's imposition of a penalty on energy producers is unconstitutionally vague, as it provides unfettered discretion to the New York Department of Environmental Conservation to determine how much each energy producer's penalties should be. Due Process "requires the invalidation of laws that are impermissibly vague," meaning that they "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited, or [are] so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted). Thus, the Due Process Clause ensures "that regulated parties should know what is required of them so they may act accordingly" and requires "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* Moreover, when civil penalties are "prohibitory" and have a "stigmatizing effect," courts apply a "strict" vagueness test. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

177.    Here, the Act is subject to a "strict" vagueness test because "the prohibitory and stigmatizing effects of the [law] are clear," *id.* at 499 & n.16—it punishes energy producers for

their products and labels them as the culprits for climate change. Under that test, the Act is unconstitutionally vague because it fails to give adequate notice to energy producers of how many responsible parties will be covered under the Act and exactly what each responsible party will have to pay. The Act leaves that decision to the New York Department of Environmental Conservation. The New York Department of Environmental Conservation determines which energy producers are responsible parties and what each energy producer's purported share of global emissions and penalty owed will be. § 76-0103(3). Thus, the New York Department of Environmental Conservation has seemingly "unfettered discretion" to subject energy producers to penalties in the hundreds of millions or billions of dollars. *Hayes v. N.Y. Att'y Grievance Comm. of the Eight Jud. Dist.*, 672 F.3d 158, 169 (2d Cir. 2012) (citation omitted). That discretion "encourages seriously discriminatory enforcement." *Fox Television Stations, Inc.*, 567 U.S. at 253.

178.    *Fifth*, the Act imposes significant penalties on energy producers without sufficient procedural safeguards, which will lead to arbitrary and excessive penalties in violation of the Due Process Clause. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416; *see also Gore*, 517 U.S. at 562 (similar). Just as the Due Process Clause places both "procedural and substantive constitutional limitations" on the amount of punitive damages that can be awarded against a defendant, *State Farm*, 538 U.S. at 416, it places the same limits on the amount for which a State may penalize individuals or businesses for other forms of liability. In *State Farm*, for example, the Supreme Court was concerned about the lack of "protections" to defendants in civil cases from the "imprecise manner" in which punitive damages were calculated and the "wide discretion" juries had in calculating them. 538 U.S. at 417 (citation omitted). To address that lack of

protections, the Court imposed specific "guideposts" to ensure that punitive damage awards did not run afoul of due process protections. *Id.* at 418.

179.    New York's Act contains no such guideposts. Even though the Act ascribes a $75 billion total cost to New York, that total number does not restrain arbitrary enforcement against potentially covered parties for their specific penalties. Based upon the memorandum circulated by the Act's sponsors, that possible amount varies wildly—from $200,000 annually at the low end to $644 million annually for 25 years at the high end. Covered Companies Memorandum at 2; *see supra* ¶ 19. And that amount will change based on how many responsible parties the Department of Environmental Conservation identifies as covered by the Act, which will affect each party's share. The lack of procedural safeguards ensuring that the Act's penalties comply with due process are made worse by the facts that the Act imposes retroactive liability for global emissions that cannot be accurately attributed to energy producers or purported impacts to New York and that the Act covers a period of 25 years. Just as punitive damages "[i]mposed indiscriminately" and without proper procedural "protections" "pose an acute danger of arbitrary deprivation of property," *State Farm*, 538 U.S. at 417 (citation omitted), the Act's imposition of undefined penalties based on global emissions, calculated in New York agencies' discretion, poses an acute risk of substantial harm to energy producers and the individuals and businesses who rely on them.

180.    These concerns are heightened by the Act's additional penalties for late payments. The Act provides that any responsible party that "fails to make a payment required" by the Act "shall pay a penalty of fifty per centum of the unpaid payment amount, plus interest on the unpaid payment amount . . . from the date the payment was required to be paid." § 76-0103(3)(e)(ii). In other words, the additional late-payment penalty is tied to the cost recovery demand penalty, which could lead to even more onerous and arbitrary penalties against responsible parties.

181.    Because the Act violates the Constitution's due process protections, it cannot be enforced against the Chamber's, API's, NMA's, and BCNYS's covered members.

182.    If the Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's, API's, NMA's, and BCNYS's covered members.

**COUNT IV**
**VIOLATION OF THE COMMERCE CLAUSE OF THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**

183.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

184.    The Constitution vests Congress with the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const., Art. I, § 8, cl. 3.

185.    Within the Constitution's Commerce Clause, the Supreme Court has recognized a "dormant Commerce Clause," under which "state laws offend the Commerce Clause when they seek to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States,' regardless of whether Congress has spoken." *Nat'l Pork Producers Council*, 598 U.S. at 369 (alteration in original) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)). Thus, "[g]enerally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336-37.

186.    A State violates the dormant Commerce Clause when it "discriminat[es] against interstate commerce." *Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 373 n.18 (1994); *Nat'l Pork Producers Council*, 598 U.S. at 369 ("[The] antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence." (citation omitted)).

187.    The foreign Commerce Clause also restricts States from enacting laws that burden or discriminate against foreign commerce. U.S. Const. art. I, § 8, cl. 3. This doctrine safeguards

the federal government's exclusive authority to regulate international trade and ensures that the United States presents a unified and coherent voice in its dealings with foreign nations. *See Japan Line, Ltd.*, 441 U.S. at 448 ("Foreign commerce is pre-eminently a matter of national concern."); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66 (1st Cir. 1999) ("[T]he Foreign Commerce Clause . . . restrains the states from excessive interference in foreign affairs."), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). Such a unified approach is essential to maintain diplomatic consistency and avoid fragmented or conflicting state-level policies that could undermine national interests. *See id.* For these reasons, the Supreme Court considers "the scope of the foreign commerce power" of the federal government to be "greater" than the interstate commerce power. *Japan Line, Ltd.*, 441 U.S. at 448.

188.    The New York Act violates the dormant Commerce Clause because it discriminates against the important economic interests of other States by specifically targeting energy producers largely headquartered and operating in other States with excessive penalties. *See Nat'l Pork Producers Council*, 598 U.S. at 364 ("[N]o State may use its laws to discriminate purposefully against out-of-state economic interests."). *First*, New York discriminates against the economic interests of every other State by unilaterally impacting energy production and cost throughout the country. By penalizing energy producers located outside of New York with massive fines, New York will encumber domestic energy production with significant costs that could harm the entire nation, but only New York will reap financial benefits from this statutory scheme (through payment for its future climate projects). *Second*, by discriminating against out-of-state energy producers, New York harms other States that depend largely on conventional energy production, like Texas, Louisiana, Oklahoma, North Dakota, West Virginia, and Pennsylvania, penalizing those means of energy production but not others that New York may prefer like wind or solar or other renewable

energy sources. Indeed, there are no energy producers that conduct coal mining or fossil fuel re-fining activities in New York. *See supra* ¶¶ 36, 50. In either case, New York exceeds the bounds of its authority and trespasses upon "the principles of 'sovereignty and comity'" with other States. *Nat'l Pork Producers Council*, 598 U.S. at 376 (citation omitted).

189.    New York's law also violates the foreign Commerce Clause because it interferes with and discriminates against a vital area of foreign commerce—energy production and trade. The United States imports "about 8.51 million barrels per day (b/d) of petroleum from 86 coun-tries" and exports "about 10.15 million b/d of petroleum to 173 countries and 3 U.S. territories." How Much Petroleum Does the United States Import and Export?, U.S. Energy Info. Admin. (Mar. 29, 2024), https://perma.cc/5YG3-ML2X. Likewise, "the United States is . . . one of the top ex-porters of liquefied natural gas (LNG) in the world." Natural Gas Explained, U.S. Energy Info. Admin. (June 30, 2023), https://perma.cc/6YKL-L22F. In addition, the United States exports a substantial amount of coal—with roughly 14% of United States coal production being shipped to 71 countries. *See* Coal explained, U.S. Energy Info. Admin. (Sept. 14, 2023), https://perma.cc/5ZQU-MAZL.

190.    New York's law interferes with international trade in such resources by imposing penalties on domestic energy producers who export energy products internationally and on foreign energy producers who import energy products into the United States for those companies' share of global greenhouse gas emissions. In doing so, it discriminates against the economic interests of the United States' key trade partners, potentially increasing costs for them and their citizens while New York reaps the financial benefits from this statutory scheme (through payment for its future climate projects). It also discriminates against foreign energy producers and domestic energy pro-ducers that operate overseas by penalizing them for global greenhouse gas emissions, thereby

harming those companies and countries that rely on their international business. *See Nat'l Foreign Trade Council*, 181 F.3d at 68 ("When the Constitution speaks of foreign commerce, it is not referring only to attempts to regulate the conduct of foreign companies; it is *also* referring to attempts to restrict the actions of American companies overseas."). Indeed, the Act penalizes foreign entities, including foreign affiliates of domestic entities, that are in a "controlled group" as defined by the Act, irrespective of whether New York has jurisdiction over any such affiliated entities within the group. § 76-0101(5), (11).

191.    Thus, the Act risks disrupting international trade in the energy industry by potentially increasing costs for both domestic and international consumers and interferes with the federal government's exclusive authority over international trade by potentially negatively affecting energy policy with foreign trade partners, preventing the federal government from speaking with one voice in this area of international commerce. Indeed, the U.S. Solicitor General recently acknowledged the limits on States' abilities to regulate greenhouse gas emissions outside their borders under the Commerce Clause. Brief for the United States as Amicus Curiae at 6-7, *Sunoco LP v. City & County of Honolulu*, No. 23-947 (U.S. Dec. 10, 2024) (emphasis added); *see supra* ¶ 104.

192.    Because the Act violates the Constitution's dormant Commerce Clause and foreign Commerce Clause, it cannot be enforced against the Chamber's, API's, NMA's, and BCNYS's covered members.

193.    If the Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's, API's, NMA's, and BCNYS's covered members.

**COUNT V**
**VIOLATION OF THE EXCESSIVE FINES CLAUSE OF THE EIGHTH AMENDMENT**
**TO THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**

194.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

195.    The Act imposes an excessive fine in violation of the Eighth Amendment to the U.S. Constitution. U.S. Const. amend. VIII.

196.    The Eighth Amendment provides, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *Id.*

197.    This protection "traces its venerable lineage back to at least 1215," to the Magna Carta. *Timbs v. Indiana*, 586 U.S. 146, 151 (2019). The "Magna Carta required that economic sanctions 'be proportioned to the wrong' and 'not be so large as to deprive [an offender] of his livelihood.'" *Id.* (alteration in original) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 271 (1989)).

198.    Following from this ancient tradition, the Eighth Amendment prohibits the government from imposing excessive fines as a form of punishment. *See Austin*, 509 U.S. at 609-10; *see also United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998). This prohibition applies in criminal proceedings and civil proceedings that "advance punitive as well as remedial goals." *Austin*, 509 U.S. at 610, 621-22.

199.    "The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as *punishment* for some offense." *Id.* at 609-10 (cleaned up). Punishment "cuts across the division between the civil and the criminal law." *Id.* at 610 (cleaned up).

200.    The Act imposes a penalty that constitutes an excessive fine in violation of the Eighth Amendment. That penalty punishes energy producers for greenhouse gas emissions related to the use of all fossil fuels and the purported impacts on climate change. The Act's punishment targets only a select number of largely domestic energy producers, pinning the blame for climate change impacts on those select producers who were lawfully operating while ignoring the myriad end users across the world who emit the majority of greenhouse gases (and many of whom fail to

mitigate their own emissions). This selective targeting of a handful of energy producers, while ignoring a host of other producers, businesses, and consumers, demonstrates a mismatch between the Act's provisions and its purported goal of mitigating the impacts of climate change, suggesting that the true purpose of the Act is to punish those energy producers disfavored by New York.

201.    The punishment is also in the form of legislatively determined "strict liability," § 76-0103(2)(a)—punishing energy producers for simply operating their lawful businesses. That is, it does not hold energy producers liable for violating some standard of care in their operations; it punishes them for producing energy.

202.    Likewise, the severe nature of the penalty imposed by the Act on energy producers—$75 billion in total, and hundreds of millions or billions of dollars imposed on individual producers—suggests that the Act is punitive in nature.

203.    The fine imposed by the Act is unconstitutionally excessive. A fine is unconstitutionally excessive "if it is grossly disproportional to the gravity of the offense." *Bajakajian*, 524 U.S. at 334.

204.    Courts evaluate four factors to determine whether a fine is constitutionally excessive: "(1) the essence of the [offense] of the [purported wrong-doer] and its relation to other [bad acts], (2) whether the [purported wrong-doer] fits into the class of persons for whom the statute was principally designed, (3) the maximum . . . fine that could have been imposed, and (4) the nature of the harm caused by the [purported wrong-doer's] conduct." *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015) (cleaned up). But these factors are not exhaustive. *See United States v. Viloski*, 814 F.3d 104, 110-11 (2d Cir. 2016).

205.    Here, the Act is retroactively punishing lawful business activities—the production of energy, whether to support domestic energy needs or energy around the globe. *See Bajakajian*,

524 U.S. at 337-38. Energy production that New York's government has often encouraged. *See, e.g.*, Campanile, *supra* ¶ 33 (discussing how New York's governor approved natural gas pumping to meet cold weather demands just this year even though the State admitted it was "inconsistent with and would interfere with the statewide greenhouse gas (GHG) emission limits").

206.    To make it worse, that retroactive punishment stretches back over 25 years.

207.    The penalty is also based on global greenhouse gas emissions, and for the reasons explained above, *see supra* ¶¶ 41-49, attributing specific impacts in New York to climate change and tracing those impacts back to specific greenhouse gas emissions from a particular source will be impossible. Thus, there is significant risk that the Act will impose penalties that overestimate and arbitrarily attribute greenhouse gas emissions to covered energy producers, and that overestimation of liability makes the penalty excessive. *See New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 600 (2d Cir. 2019) (fine was excessive when it "double count[ed]" the party's liability). Even worse, the Act does not differentiate between the impacts of climate change purportedly caused by greenhouse gas emissions from fossil fuels versus emissions from other sources or other causes of climate change; in failing to do so, it imposes all the purported costs of climate change onto a select group of energy producers.

208.    The maximum possible fine here is significant. Based on the Act's sponsors' estimates, the potential penalties could reach as high as hundreds of millions *annually* for 25 years. *See supra* ¶ 19 (penalties range from $200,000 *annually* at the low end to $644 million *annually* at the high end). Moreover, the maximum fine is increased even further if a covered energy producer is late in paying its penalty. § 76-0103(3)(e)(ii) (requiring a responsible party making a late payment to "pay a penalty of fifty per centum of the unpaid amount, plus interest . . . from the date the payment was required to be paid").

209.    For these reasons, the Act violates the Eighth Amendment to the U.S. Constitution by creating a scheme for the imposition of fines that will be grossly disproportional to the gravity of any purported offense committed.

210.    Because the Act violates the Constitution's protections against excessive fines, it cannot be enforced against the Chamber's, API's, NMA's, and BCNYS's covered members.

211.    If the Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's, API's, NMA's, and BCNYS's covered members.

**COUNT VI**
**VIOLATION OF THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**

212.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

213.    The Act constitutes an unconstitutional taking in violation of the Fifth Amendment to the U.S. Constitution. U.S. Const. amend. V.

214.    The federal Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Fourteenth Amendment incorporates the Takings Clause against the States. *Sheetz v. County of El Dorado*, 601 U.S. 267, 276 (2024).

215.    Plaintiffs may bring a claim for prospective injunctive relief against state officials in their official capacity for violations of the Takings Clause. *See, e.g.*, *Greater Chautauqua Fed. Credit Union v. Marks*, 600 F. Supp. 3d 405, 420-21 (S.D.N.Y. 2022) (citing *Hutto v. Finney*, 437 U.S. 678, 690 (1978)); *Ex parte Young*, 209 U.S. at 123.

216.    The Act imposes "cost recovery demands" that require energy producers to hand over funds—their property—to New York. § 76-0103(3)(e)(i). New York then uses those funds for

its preferred "climate change adaptive infrastructure projects" within the State without providing just compensation to energy producers. § 76-0103(2).

217.    The Act effects a regulatory taking, requiring the imposition of penalties on covered energy producers that go "too far" in regulating those companies so as to amount to an unconstitutional taking. *Cedar Point Nursery*, 594 U.S. at 149 (2021). The magnitude of these penalties, coupled with their retroactive application, effectively confiscates a portion of covered energy producers' past and present assets. *See E. Enters.*, 524 U.S. at 528-29 (plurality opinion) (holding that legislation can be "unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.").[22]

218.    In considering whether a regulatory taking has occurred, courts consider "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017).

219.    The Act has a substantial economic impact on covered energy producers. It imposes a substantial and disproportionate penalty—potentially in the hundreds of millions or billions of dollars—on a select group of covered energy producers, requiring them to pay for climate change adaptation projects. *E. Enters.*, 524 U.S. at 529 (plurality opinion) (holding that there was "no doubt that the Coal Act has forced a considerable financial burden upon" the plaintiff where it had

---

[22] The Second Circuit has held that "no 'common denominator' can be said to exist among the Court's opinions" in *Eastern Enterprises*, and therefore, "[t]he only binding aspect of such a splintered decision is its specific result, and so the authority of *Eastern Enterprises* is confined to its holding that the Coal Act is unconstitutional as applied to Eastern Enterprises." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003). Nevertheless, the plurality's Takings Clause analysis in *Eastern Enterprises* is persuasive authority that should be applied to the New York Act here.

to make retroactive payments "on the order of $50 to $100 million"). Those penalties will have a severe economic impact not only on energy producers, but also potentially on consumers and businesses throughout the United States.

220.    The Act also upsets the reasonable, investment-backed expectations of covered energy producers by imposing severe retroactive penalties on previously (and currently) lawful conduct. The Takings Clause "provides a . . . safeguard against retrospective legislation concerning property rights." *Id.* at 533-34. Here, the Act holds energy producers strictly liable for 25 years of lawful energy producing operations. *See id.* at 532 (plurality opinion) (holding that Coal Act "substantially interfere[d]" with party's "reasonable investment-backed expectations" where the "Act's beneficiary allocation scheme reaches back 30 to 50 years to impose liability"). Those retrospective penalties punish energy producers for actions taken many years before New York ever considered imposing such liability, all while energy producers were subject to and complying with the federal and state laws in force at the time. Such "retroactive liability is substantial and particularly far reaching," *id.* at 534, upsetting energy producers' reasonable investment-backed expectations. In short, the Act turns the investment-backed expectations of covered energy producers on their heads, wrongly punishing them for legally operating their businesses for 25 years.

221.    The Act essentially imposes strict tort liability via statute on covered energy producers to pay for New York's desired climate change adaptation projects. In other words, it places a targeted and specific group of covered energy producers on the hook for global greenhouse gas emissions and the impacts of climate change stretching back 25 years, imposing penalties on those companies while ignoring others that also contributed to such emissions. *See id.* at 537 (plurality opinion) (holding that "the nature of the governmental action" was "quite unusual" where the government's "solution singles out certain employers to bear a burden that is substantial in amount,

82

based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused," and therefore, such "governmental action implicates fundamental principles of fairness underlying the Takings Clause"). In doing so, the Act runs afoul of the Takings Clause, which "prevent[s] the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Id.* at 522 (citation omitted).

222.    For these reasons, the Act unconstitutionally effects a regulatory taking without providing just compensation.

223.    Because the Act violates the Fifth Amendment's Takings Clause, it cannot be enforced against the Chamber's, API's, NMA's, and BCNYS's covered members.

224.    If the Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's, API's, NMA's, and BCNYS's covered members.

## COUNT VII
## EQUITABLE RELIEF

225.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

226.    The Act—both as a whole and its individual challenged provisions—violates federal law and deprives Plaintiffs' covered members of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

227.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing the Act and all the challenged provisions of the Act against Plaintiffs and their covered members.

228.    Injunctive relief is proper where a plaintiff demonstrates "actual success on the merits," *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011), and establishes the standard factors

for obtaining equitable relief—"(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (citation omitted).

229. *First*, on the merits, the Act is barred by the U.S. Constitution and federal statutes like the Clean Air Act, and the Act violates the constitutional rights of Plaintiffs' covered members.

230. *Second*, Plaintiffs' covered members face irreparable injury absent an injunction and remedies available at law are inadequate to compensate for that injury. Here, energy producers will either be forced either to pay hundreds of millions or even billions of dollars in penalties to New York under the Act or to expend time and resources proving that they are not covered by the Act because they lack sufficient contacts with the State to satisfy the Due Process Clause of the U.S. Constitution.

231. Although "[m]onetary loss alone will generally not amount to irreparable harm," where "the movant provides evidence of damage that cannot be rectified by financial compensation," there is irreparable harm. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991) (citation omitted). Further, where a plaintiff cannot recover damages due to sovereign immunity, irreparable harm may be presumed. *See United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (affirming the district court's finding that the plaintiffs "injury was irreparable even though [its] losses were only pecuniary because a suit in federal court against [the defendant,] New York[,] to recover the damages sustained by [the plaintiff] would be barred by the Eleventh Amendment"); *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020); *John E. Andrus Mem'l, Inc. v. Dainers*, 600 F. Supp. 2d 563, 572 n.6 (S.D.N.Y. 2009).

232.    Here, any monetary relief Plaintiffs might seek would be barred by sovereign immunity. Without an injunction, New York can impose penalties through what the Act refers to as "cost recovery demands." Responsible parties who receive notices of cost recovery demands are then "strictly liable" for their purported share of greenhouse gas emissions, and New York may demand payment to the State as punishment for that purported liability. § 76-0103(3)(a).

233.    *Third*, the equities favor an injunction. When the government is the opposing party, the third and fourth factors, "harm to the opposing party and weighing the public interest," merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal."). Enjoining Defendants from unlawfully regulating greenhouse gas emissions beyond New York's borders and burdening energy producers is in the public interest.

234.    For the foregoing reasons, the Court should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing the Act and all the challenged provisions of the Act against Plaintiffs' covered members.

## COUNT VIII
### 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
### DECLARATORY RELIEF

235.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

236.    New York's Act is precluded by the federal Constitution and preempted by the Clean Air Act and violates the Due Process Clause of the Fourteenth Amendment to the Constitution, as well as other constitutional provisions incorporated against the States under the Due

Process Clause. New York's Act therefore deprives Plaintiffs and their covered members of enforceable federal rights.

237.    The precluded, preempted, unconstitutional, and unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable against Plaintiffs' covered members.

238.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

239.    This Court can and should exercise its equitable power to enter a declaration that the entire Act is precluded, preempted, unconstitutional, and otherwise unlawful as applied to Plaintiffs' covered members.

## PRAYER FOR RELIEF

Plaintiffs request an order and judgment:

a.  declaring that the Act, S.2129B as amended by S.824, is unlawful;

b.  declaring that the Act, S.2129B as amended by S.824, is precluded by the United States Constitution;

c.  declaring that the Act, S.2129B as amended by S.824, is preempted by the Clean Air Act;

d.  declaring that the Act, S.2129B as amended by S.824, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

e.  declaring that the Act, S.2129B as amended by S.824, violates the Commerce Clause of the United States Constitution;

f.  declaring that the Act, S.2129B as amended by S.824, violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution as incorporated against the States;

g.  declaring that the Act, S.2129B as amended by S.824, violates the Takings Clause of the Fifth Amendment to the United States Constitution as incorporated against the States;

h.  enjoining Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiffs' covered members;

i.   entering judgment in favor of Plaintiffs;

j.   awarding Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

k.   awarding Plaintiffs all other such relief as the Court deems proper and just.

Dated: February 28, 2025

Jennifer B. Dickey*
Kevin R. Palmer*
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Plaintiff the Chamber of Commerce of the United States of America*

Ryan Meyers*
American Petroleum Institute
200 Massachusetts Avenue, NW,
 Suite 1200
Washington, DC 20001
Telephone: (202) 682-8000

*Counsel for Plaintiff American Petroleum Institute*

Tawny Bridgeford*
National Mining Association
101 Constitution Avenue, NW
Washington, DC 20001
Telephone: (202) 463-2629

*Counsel for Plaintiff National Mining Association*

Heather Briccetti Mulligan*
The Business Council of New York State, Inc.
111 Washington Avenue, Suite 400
Albany, NY
Telephone: (518) 465-7511

*Counsel for Plaintiff The Business Council of New York State, Inc.*

*\*pro hac vice forthcoming*

Respectfully submitted,

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky*
Scott A. Keller*
Michael B. Schon*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
 Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: steve@lkcfirm.com
Email: scott@lkcfirm.com
Email: mike@lkcfirm.com

Matthew H. Frederick*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: matt@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: jared@lkcfirm.com

Meredith R. Criner*
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: meredith@lkcfirm.com

*Counsel for Plaintiffs the Chamber of Commerce of the United States of America, American Petroleum Institute, National Mining Association, and The Business Council of New York State, Inc.*